UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| GIUSEPPE PEZZOTTI, | | **Case No.** 3:22-cv-01283 (MAD/ML) |
| | Plaintiff, | |
| vs. | | **COMPLAINT** |
| CORNELL UNIVERSITY, | | **Jury Trial Demanded** |
| | Defendant. | |

Plaintiff, Giuseppe Pezzotti ("plaintiff") by and through his attorneys, H. Roske &

Associates LLP, for his complaint against defendant, Cornell University ("defendant"), states

and alleges as follows:

### THE NATURE OF THE ACTION

**1.** Plaintiff commences this action against defendant on the basis that it discriminated against

him in violation of Title IX of the Education Amendments of 1972. More specifically, plaintiff

maintains that defendant conducted a deeply flawed investigation into a complaint by Jane Doe

("complainant") alleging plaintiff committed violations of defendant's Policy 6.4, during a

campus dinner event held on March 15, 2019.

**2.** As a direct consequence of the improper investigation, plaintiff claims that he was wrongly

found responsible for violations of defendant's Policy 6.4, which constituted an "erroneous

outcome" under the caselaw.

**3.** By virtue of defendant's wrongful conduct, plaintiff contends he suffered injury proximately

related thereto, for which he now seeks monetary damages, attorney's fees and injunctive relief.

[1]

## JURISDICTION & VENUE

**4.** Pursuant to 28 USC §1331 this Court has subject matter jurisdiction over the claims asserted

in the complaint, as they arise under the constitution and statutes of the United States (Title IX

of the Educational Amendments of 1972, 20 USC §§1681 and 1682).

**5.** Pursuant to 28 USC §1391 venue properly reposes with this Court as both plaintiff and

defendant reside within the Northern District of New York and the actions, omissions and

other claimed wrongs occurred therein.

**6.** This Court has *in personam* jurisdiction over defendant as: its main university campus is

situate in the City of Ithaca, Tompkins County, where it engages in the purposeful activity of

educating undergraduate and graduate students; and the civil wrongs alleged by plaintiff

occurred on defendant's main campus in Ithaca, New York.

## PARTIES

**7.** At all times relevant hereto plaintiff was and still is a faculty member, employed by defendant

as a senior lecturer in the Peter and Stephanie Nolan School of Hotel Administration. Plaintiff

has been employed in that capacity, or similar one, by defendant for some thirty-seven (37)

years, teaching courses in restaurant operations, management, hospitality and related subjects.

**8.** Until the time of the complaint filed by Jane Doe against him, plaintiff enjoyed an

unblemished and exemplary record of teaching excellence and service to defendant. As testament

to this, plaintiff was nominated for induction into the first inaugural class of the Cornell Hotel

Society's "Hotelier Hall of Fame". Plaintiff (along with other distinguished members of this first

[2]

class) was formally installed in a ceremony at the Pierre Hotel in New York on November 13,

2022 in recognition of his extraordinary and faithful service to defendant and the thousands of

students he has mentored over the course of his distinguished career.

**9.** At all times relevant hereto defendant was and still is a private university, the federal land

grant institution of New York State and a member of the Ivy League. Cornell administers four

(4) contract colleges, which it operates on behalf of the State University of New York.

**10.** Defendant is comprised of: seven (7) undergraduate units and four (4) graduate and

professional colleges and schools in Ithaca, New York; two (2) medical graduate and

professional units in New York City and Doha, Qatar ("Weill Cornell Medicine"); along with the

Cornell Tech Campus in New York City, which offers graduate programs in applied sciences.

**11.** As relevant and material the Peter and Stephanie Nolan School of Hotel Administration

("Hotel School") is one of three (3) schools comprising the S.C. Johnson College of Business,

together with the Charles H. Dyson School of Applied Economics and Management and the

Samuel Curtis Johnson Graduate School of Management.

NON-PARTY ACTORS

**12.** At all times relevant hereto Kate Walsh was and still is the Dean of the Hotel School. Under

Policy 6.4, then in effect at the time of the final investigative report generated by the Title IX

investigators and faculty co-investigator, Kate Walsh was the appropriate dean or unit head: a)

designated as the "reviewer" of the final investigative report; and b) charged with making a

determination with respect to a finding of responsibility and any recommended sanctions and/or

remedial measure.

[3]

**13.** Notwithstanding the mandates of Policy 6.4 (and that defendant's Title IX office stated that Kate Walsh was the reviewer in plaintiff's matter), Walsh did not act in that capacity.

**14.** At all times relevant hereto Kevin Hallock was the Dean of the S.C. Johnson College of Business. Dean Hallock acted as both reviewer of the final investigative report and adjudicator of plaintiff's appeal, in derogation of the express mandates and intent of Policy 6.4.

**15.** At all times relevant hereto Chantelle Cleary was defendant's Title IX Coordinator, tasked with oversight and/or investigation of complaints made pursuant to Policy 6.4 and other matters.

**16.** Prior to her appointment with defendant (effective June 4, 2018), Ms. Cleary was the assistant vice-president for equity/compliance and Title IX coordinator at the State University of New York at Albany from 2015 until June 2018.

**17.** On February 1, 2016, Ms. Cleary was selected by the National Center for Campus Public Safety as an instructor for "Traumatic Informed Sexual Assault Investigation and Adjudication Education".

**18.** At the time of plaintiff's investigation, Ms. Cleary and her staff in defendant's Title IX office, employed a "trauma-informed" investigative technique for complaints under Policy 6.4.

**19.** After her graduation from law school, Ms. Cleary spent the first decade of her career as an assistant district attorney assigned exclusively to the prosecution of sexual assault, intimate partner violence, stalking and crimes against children.

**20.** As relevant and material Ms. Cleary, in a prior Title IX disciplinary proceeding against a male respondent while she was the Title IX coordinator at the State University of New York at

[4]

Albany, was accused by the male respondent of conducting a deliberately biased and unfair

investigation against him.

21. After finding the male respondent responsible for the charge of sexual assault against the

the female complainant, respondent commenced a special proceeding against Cleary, pursuant to

Article 78 of the New York Civil Practice Law & Rules.

22. On February 22, 2019 the NYS Supreme Court denied respondent's application for

discovery, but remanded the issue of his alleged violation of the Code of Conduct to the

Appellate Division, Third Department. (See – Alexander M. v. Cleary, 188 AD 3d 1471

(3rd Dept. 2020)

23. In its November 25, 2020 decision the Appellate Division observed, in pertinent part:

> "[I]t is beyond dispute that an impartial decision maker is a core
> guarantee of due process, fully applicable to adjudicatory proceedings
> before administrative agencies. Education Law Article 129-B, known
> as the 'Enough is Enough Law', provides for the implementation by
> colleges and universities of, as relevant here, sexual assault policies
> and procedures. The rights of a student accused of sexual assault are
> found in Educational Law §6444 (5)(c) … Among these is the right to
> an impartial investigation. … Ensuring these minimum requirements is
> especially crucial in student disciplinary proceedings, an administrative
> area where traditional due process guarantees are sometimes limited and
> where there is no general constitutional right to discovery. … As to the
> possibility of individual bias, Cleary admittedly altered the facts as
> reported to her. … Cleary's phrasing portrays a significantly different
> rendering of the event. At the hearing, when Cleary was asked why she
> changed the wording, her response … bordered on the incoherent. It is
> not unreasonable to question whether Cleary changed the wording (and
> as such the alleged facts) to correspond with the definition of sexual
> assault I as found in the student code. The dissent's characterization of
> this change as mere 'rephrasing' of petitioner's account is an exercise
> in understatement. …" [Id, pp. 1474-1476; internal citations and
> quotations omitted]

[5]

**24.** At all times relevant hereto Jery Stedinger was a professor of civil and environmental engineering at defendant. Dr. Stedinger was the faculty co-investigator in plaintiff's case, assigned by defendant's dean of faculty, to assist in the investigation of the complaint against plaintiff.

**25.** By appointing Dr. Stedinger as a faculty co-investigator defendant represented to plaintiff (and other faculty respondents accused of violations of Policy 6.4) that Dr. Stedinger: had received sufficient training in all facets of investigations involving faculty/staff accused of violations of defendant's Policy 6.4; and would comport himself as an impartial investigator.

**26.** Professor Stedinger participated in investigative interviews with complainant, plaintiff and witnesses, with the exception of complainant's intake interview and plaintiff's first intake interview.

**27.** At all times relevant hereto Lauren Branchini was defendant's Deputy Title IX Coordinator for Investigations & Lead Title IX Investigator, serving in that capacity from July 2018 – June 2019. Prior to that time period Ms. Branchini served as the Lead Title IX Investigator for defendant from March 2017 – July 2018. Ms. Branchini conducted the initial "complainant" interview with Jane Doe on March 27, 2019.

**28.** Before defendant's employment of Ms. Branchini in March 2017, she served as an Assistant District Attorney in the Sex Crimes/Special Victim's Bureau of the Kings County District Attorney's Office from September 2013 – September 2016.

**29.** While attending law school at Emory University, Ms. Branchini searched media, coded news articles and interviews for the female statutory rape project and corrected transcripts and

[6]

coded interviews for the prosecutorial self-image project.

**30.** At all times relevant hereto Vanessa Bentley was employed by defendant as a Title IX

Investigator from May 2019 – June 2022. Prior to that time Ms. Bentley was employed by

defendant as a full-time police officer in the Cornell University Police Department from

January 2013 – May 2019.

**31.** Ms. Bentley attended the State University of New York at Albany from August 2004 - May

2008, receiving a bachelor's degree in sociology and a master's degree in criminal justice.

Ms. Bentley is a certified Forensic Experiential Trauma Interviewer.

**32.** In her capacity as a Title IX investigator, Ms. Bentley acted as a co-investigator in plaintiff's

case, together with lead investigator Chantelle Cleary and faculty co-investigator, Jery Stedinger.

Ms. Bentley actively participated in the investigative interviews of plaintiff (June 25, 2019),

complainant Jane Doe (July 3, 2019), witness Sophia Lin Kanno (May 17, 2019) and witness

Michelle Lin (July 17, 2019).

**33**. At all times relevant hereto Jane Doe was a female undergraduate student in the Hotel

School. Jane Doe received a B.S. in Hotel Administration from defendant in May 2020.

**34.** From August 2018 – May 2020 Jane Doe was a teaching assistant in the Hotel School.

Notably, Jane Doe also served as a student assistant in Dean Hallock's Office from

October 2019 – May 2020 (i.e., in the S.C. Johnson College of Business) at a time when: her

complaint against plaintiff was being investigated by the Title IX office; Dean Hallock acted as

reviewer of the final Investigative report concerning plaintiff (finding plaintiff "responsible"

[7]

of violating Policy 6.4); and Dean Hallock acted as adjudicator of plaintiff's appeal, which

plaintiff urged was predicated on an erroneous finding of responsibility. Ultimately, on appeal

Dean Hallock refused to overturn his initial finding that plaintiff had violated Policy 6.4, by a

preponderance of the evidence, or to reduce the sanctions imposed on plaintiff.

## I. GENERAL FACTUAL ALLEGATIONS

### A. (US Department of Education, Office of Civil Rights Guidance on Title IX)

**35.** The foundational statute, upon which the Office of Civil Rights ("OCR") of the U.S.

Department of Education ("DOE") issues guidance to colleges and universities in matters

involving the investigation and resolution of complaints of sexual violence and misconduct, is

20 USC §1681(a).

**36.** This statute provides:

> "[N]o person in the United States shall, on the basis of sex, be
> excluded from participation in, be denied the benefits of, or
> be subjected to discrimination under any education program
> or activity receiving Federal financial assistance, …"

**37.** Enforcement of this statute by DOE/OCR is conferred by 20 USC §1682 which reads,

in pertinent part:

> "[E]ach Federal department and agency which is empowered to
> extend Federal financial assistance to any educational program
> or activity, by way of grant, loan, or contract … is authorized and
> directed to effectuate the provisions of section 1681 of this title
> with respect to such program or activity by issuing rules, regulations,
> or orders of general applicability which shall be consistent with
> achievement of the objectives of the statute authorizing the financial
> assistance in connection with which the action is taken. …
> Compliance with any requirement adopted pursuant to this section

[8]

> may be effected (1) by the termination of or refusal to grant or to
> continue assistance under such program or activity to any recipient as
> to whom there has been an express finding on the record, after
> opportunity for hearing, of a failure to comply with such requirement. …"

**38.** According to defendant's 2019-2020 Financial Report, for fiscal year 2019 the university

received a total of $679,599,000 in federal funding. This figure was a significant component of

the $4,344,807,000 in in total operating revenues for that year, representing 15.65% of the entire

operating revenues garnered by defendant.

**39.** This same financial report showed that the amount of DOE grants/aid to defendant for fiscal

year 2019 totaled $173,095,587, or 25.47% of all federal aid to the university.

**40.** OCR guidance, to defendant and other post-secondary educational institutions receiving

DOE aid and grants, consisted of:

### 1. The 1997 Guidance

**41.** Issued by OCR in March 1997 this document, entitled 'Sexual Harassment Guidance:

Harassment of Students by School Employees, Other Students or Third Parties', contained these

relevant directives to defendant and other post-secondary schools:

**a)** schools are required by Title IX to adopt and publish a policy against sex discrimination

and grievance procedures providing for prompt and equitable resolution of complaints of

discrimination on the basis of sex. [pg. 13];

**b)** OCR has identified a number of elements in evaluating whether a school's grievance

procedures are prompt and equitable, including whether the procedures provide for …

adequate, reliable and impartial investigation of complaints, including the opportunity

to present witnesses and other evidence. [pg. 13]; and

**c)** designated and reasonably prompt timeframes for the major stages of the complaint

process. [pg. 13]

## 2. The 2001 Guidance

**42.** This document was published by OCR on January 19, 2001. According to its preamble, this

revised guidance was issued in response to US Supreme Court decisions in Gebser v. Lago Vista

Independent School District, 524 US 274 (1998) and Davis v. Monroe County Board of

Education, 526 US 629 (1999), which permitted students to sue their educational institutions

for monetary damages, in the event Title IX violations were found. In this regard, the guidance

explained:

> "In Gebser, the Court was concerned with the possibility of a money damages
> award against a school for harassment about which it had not known. In
> contrast, the process of administrative enforcement requires enforcement
> agencies such as OCR to make schools aware of potential Title IX violations
> and to seek voluntary corrective action before pursuing fund termination or
> or other enforcement mechanisms." [pg. 4]

**43.** In large part, however, the 2001 guidance re-affirmed the 1997 guidance principles, and

expanded upon the definition of sexual harassment. However, the guidance also made several

new pronouncements:

**a)** sexual harassment was defined as 'unwelcome conduct of a sexual nature'. Sexual

harassment included unwelcome sexual advances, requests for sexual favors, and other

verbal, nonverbal or physical conduct of a sexual nature. [pg. 8];

**b)** instead of defining specific categories of sexual harassment, the guidance advised schools

[10]

to determine sexual harassment in broader terms, e.g. whether the harassment rose to a level that denied or limited a student's ability to participate in or benefit from a school program or activity because of sex. [pg. 11];

c) if there was a dispute or uncertainty as to whether harassment occurred, the ensuing factors would be material –

    **(1)** statement(s) by witness(es) to the alleged incident [pg. 14],

    **(2)** evidence concerning the relative credibility of the harassed student and the perpetrator of the harassment [pg. 14],

    **(3)** evidence that the harassing individual has been found to have harassed others in the past [pg. 14] and

    **(4)** evidence of the allegedly harassed student's reaction or behavior after the harassment incident. [pg. 14]; and

d) regarding due process in school administrative proceedings, having in place procedures which, at once, ensure the Title IX rights of the complainant, while affording due process to both parties involved, leading to sound and supportable decisions. [pg. 24]

### 3. The Dear Colleague Letter of April 4, 2011 ("2011 DCL")

**44.** In this guidance, OCR focused on the definition of sexual harassment as including 'sexual violence', which was defined as "physical sexual acts perpetrated against a person's will or where a person is incapable of giving consent due to the victim's use of drugs or alcohol." In explaining what acts were comprehended by the term sexual violence, OCR cited rape,

sexual assault, sexual battery and sexual coercion – all of which were forms of sexual harassment under Title IX.

**45.** In specific terms this guidance decreed:

**a)** Title IX protects students from sexual harassment in a school's education programs and activities, defined as all academic, educational, extracurricular, athletic and other programs, irrespective whether this occurred at the school campus, on a bus, or elsewhere [pp. 3, 4];

**b)** regardless of the identity of the complainant, Title IX obligates the school to promptly investigate and resolve the alleged sexual harassment. In all cases, the school's investigatory and adjudication processes must be "prompt, thorough and impartial" [pp. 4, 5];

**c)** all recipients of federal financial assistance from DOE are required to adopt and publish procedures providing for prompt and equitable resolution of sex discrimination complaints [pg. 6];

**d)** in determining whether a school's grievance procedure complies with Title IX's requirements, OCR found these factors crucial –

(**1**) adequate, reliable and impartial investigation of complaints, including the opportunity for both parties to present witnesses and other evidence [pg. 10],

(**2**) designated and reasonably prompt time frames for the major stages of the complaint process [pg. 10],

(**3**) whether the school was using a preponderance of evidence standard to determine

[12]

whether sexual harassment had occurred. In discussing the quantum of proof, the OCR explicitly stated, "[i]n order for a school's grievance procedures to be consistent with Title IX standards, the school must use a preponderance of the evidence standard … The 'clear and convincing' standard, currently used by some schools, is a higher standard of proof. Grievance procedures that use this higher standard are inconsistent with the standard of proof established for violations of the civil rights laws, and are thus not equitable under Title IX. Therefore, preponderance of the evidence is the appropriate standard for investigating allegations of sexual harassment or violence. ..." [pg. 11],

**(4)** as to training of investigators and adjudicators, OCR mandated that they have "[t]raining or experience in handling complaints of sexual harassment and sexual violence, and in the recipient's grievance procedures." [pg. 12],

**(5)** in regard to required impartiality of a school's investigative and adjudicative procedures for resolution of complaints alleging sexual harassment, OCR declared, "[a] school's investigation and hearing processes cannot be equitable unless they are impartial. Therefore, any real or perceived conflicts of interest between the fact-finder or decision maker and the parties should be disclosed." [pg. 12].

**4. Questions and Answers on Title IX and Sexual Violence – April 29, 2014 ("2014 Q&A")**

**46.** In her prefatory statement about this guidance, Assistant Secretary of Education for Civil Rights, Catherine E. Lhamon remarked:

"[I]n responding to requests for technical assistance, OCR has determined that elementary and secondary schools and postsecondary institutions would benefit from additional guidance concerning their obligations under Title IX to address sexual violence as a form of sexual harassment. The following questions and answers further clarify the legal requirements and guidance articulated in the DCL and the 2001 Guidance and include examples of proactive efforts schools can take to prevent sexual violence and remedies schools may use to end such conduct, prevent its recurrence, and address its effects." [pg. ii]

47. In this guidance, OCR expressly stated that the DCL and 2001 Guidance remained in full force and effect. [pg. ii]

48. As relevant and material, the 2014 Q&A provided:

a) on employee-on-student violence –

"[A]lthough this document and the DCL focus on student-on-student sexual violence, Title IX also protects students from other forms of sexual harassment (including sexual violence and sexual abuse), such as sexual harassment carried out by school employees. Sexual harassment by school employees can include unwelcome sexual advances; requests for sexual favors; and other verbal, nonverbal, or physical conduct of a sexual nature, including but not limited to sexual activity. Title IX's prohibition against sexual harassment generally does not extend to legitimate nonsexual touching or other nonsexual conduct. …" [pp. 3, 4];

b) on what should be included in a school's procedures for responding to complaints of sexual violence –

"(3) [p]rovisions for adequate, reliable, and impartial investigation of complaints, including the opportunity for both the complainant and alleged perpetrator to present witnesses and evidence." [pg. 12], and

"(4) designated and reasonably prompt time frames for the major stages of the complaint process." [pg. 12];

c) on what should be in a school's Title IX grievance procedures –

[14]

"(8) the evidentiary standard that must be used (preponderance of the evidence) (i.e., more likely than not that sexual violence occurred) in resolving a complaint." [pg. 13];

**d)** on the elements a school's Title IX investigation should include –

"[F]or purposes of this document the term 'investigation' refers to the process the school uses to resolve sexual violence complaints. This includes the fact-finding investigation and any hearing and decision-making process the school uses to determine (1) whether or not the conduct occurred; and (2) if the conduct occurred, what actions the school will take to end the sexual violence, which may include imposing sanctions on the perpetrator and providing remedies for the complainant and the broader student population.

In all cases, a school's Title IX investigation must be adequate, reliable, impartial, and prompt and include the opportunity for both parties to present witnesses and other evidence. The investigation may include a hearing to determine whether the conduct occurred, but Title IX does not necessarily require a hearing. Furthermore, neither Title IX nor the DCL specifies who should conduct the investigation. It could be the Title IX coordinator, provided there are no conflicts of interest, but it does not have to be. All persons involved in conducting a school's Title IX investigation must have training or experience in handling complaints of sexual violence and in the school's grievance procedures." [pp. 24, 25];

**e)** on Title IX investigative timelines –

"[A]s noted in the DCL, the 60 calendar-day timeframe for investigations is based on OCR's experience in typical cases. The 60-calendar day timeframe refers to the entire investigative process, which includes conducting the fact-finding investigation, holding a hearing or engaging in another decision-making process to determine whether the alleged sexual violence occurred and created a hostile environment and prevent its recurrence, including imposing sanctions against the perpetrator and providing remedies for the complainant and school community, as appropriate. Although this timeframe does not include appeals, a school should be aware that an unduly long appeals process may impact whether the school's response was prompt and equitable, as required by Title IX. OCR does not require a school to complete investigations within 60 days; rather OCR evaluates on a case-by-case basis whether the resolution of sexual violence complaint is prompt and equitable. Whether OCR considers an investigation to be prompt as required by Title IX will depend on the

[15]

complexity of the investigation and the severity and extent of the alleged conduct." [pp.31, 32]; and

**f)** on the training a school must provide to those involved in Title IX grievance procedures -

"[A]ll persons involved in implementing a school's grievance procedures (e.g. Title IX coordinators, others who receive complaints, investigators, and adjudicators) must have training or experience in handling sexual violence complaints, and in the operation of the school's grievance procedures. The training should include information on working with and interviewing persons subjected to sexual violence; information on particular types of conduct that would constitute sexual violence …; the proper standard of review for sexual violence complaints (preponderance of the evidence); information on consent and the role drugs or alcohol can play in the ability to consent; the importance of accountability for individuals found to have committed sexual violence; the need for remedial actions for the perpetrator, complainant, and school community; how to determine credibility; how to evaluate evidence and weigh it in an impartial manner; how to conduct investigations; confidentiality; the effects of trauma, including neurological change; and cultural awareness training regarding how sexual violence may impact students differently depending on their cultural backgrounds." [pg. 40].

### 5. The Dear Colleague Letter of September 22, 2017 ("2017 DCL")

**49.** The 2017 DCL withdrew OCR's prior guidance embodied in the 2011 DCL and 2014 Q&A.

In this letter, the Acting Assistant Secretary of Education for Civil Rights, expressly stated that

OCR would no longer rely on these earlier guidance documents in determining a school's

compliance with Title IX. Instead, OCR directed schools to refer to the contemporaneous "Q&A

on Campus Sexual Misconduct" dated September 22, 2017, along with previous OCR documents

(e.g. the 2001 Guidance) for interim direction, pending issuance of new rules, informed by public

comment and made in conformity federal rule making protocols.

**6. Questions and Answers on Campus Sexual Misconduct – Sept. 22, 2017 ("2017 Q&A")**

**50.** As relevant and material, the 2017 Q&A provided:

a) on grievance procedures and investigations conducted by schools –

> "[A] school must adopt and publish grievance procedures that provide for prompt and equitable resolution of complaints of sex discrimination, including sexual misconduct. OCR has identified a number of elements in evaluating whether a school's grievance procedures are prompt and equitable, including whether the school … (iii) ensures an adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence; (iv) designates and follows a reasonably prompt time frame for major stages of the complaint. …" [pg. 3];

b) on what constitutes a 'prompt' investigation by schools –

> "[T]here is no fixed time frame under which a school must complete a Title IX investigation. OCR will evaluate a school's good faith effort to conduct a fair, impartial investigation in a timely manner designed to provide all parties with resolution. …" [pg. 3];

c) as to what constitutes an 'equitable' investigation by schools –

> "[I]n every investigation conducted under the school's grievance procedures, the burden is on the school – not on the parties – to gather sufficient evidence to reach a fair, impartial determination as to whether sexual misconduct has occurred and, if so, whether a hostile environment has been created that must be redressed. A person free of actual or reasonably perceived conflicts of interest and biases for or against any party must lead the investigation on behalf of the school.
>
> An equitable investigation of a Title IX complaint requires a trained investigator to analyze and document the available evidence to support reliable decisions, objectively evaluate the credibility of parties and witnesses, synthesize all available evidence – including inculpatory and exculpatory evidence – and take into account the unique and complex circumstances of each case. …
>
> Training materials or investigative techniques and approaches that apply sex stereotypes or generalizations may violate Title IX and should be avoided so that the investigation proceeds objectively and impartially. …" [pg. 4]; and

**d)** on what procedures a school should follow to adjudicate a finding of responsibility -

"[T]he investigator(s), or separate decision maker(s), with or without a hearing, must make findings of fact and conclusions as to whether the facts support a finding of responsibility for violation of the school's sexual misconduct policy. … The findings of fact and conclusions should be reached by applying either a preponderance of the evidence standard or a clear and convincing evidence standard. The standard of evidence for evaluating a claim of sexual misconduct should be consistent with the standard the school applies in other student misconduct cases."; [page 5]

### B. Policy 6.4, Applied to Resolution of Jane Doe's Complaint Against Plaintiff

**51.** Defendant's Procedure for Resolution of Reports Against Faculty Under Cornell University Policy 6.4 ("Policy 6.4") was originally enacted by the university on July 8, 1996. Subsequent to its adoption, until the time of its implementation in Jane Doe's complaint against Plaintiff, Policy 6.4 had undergone significant modifications - later including complaints against faculty accused of prohibited conduct.

**52.** The version of Policy 6.4 in effect on April 15, 2019 (the date when Jane Doe signed a formal complaint against plaintiff), and actually utilized by defendant in the resolution of Jane Doe's complaint, is annexed hereto and designated **Exhibit "A"**.

**53.** Salient features of Policy 6.4 include the following provisions:

**a)** Investigation of a formal complaint –

**(1)** [t]o gather evidence relating to the alleged prohibited conduct and to determine whether the respondent engaged in the prohibited conduct by a preponderance of the evidence [pg. 7],

**(2)** during progress of the investigation, the investigator is required to keep

[18]

both complainant and respondent apprised of the status of the investigation [pg. 8],

**(3)** if the complaint arises out of a subordinate – supervisory relationship between the complainant student and faculty respondent, the dean of faculty is required to appoint a faculty co-investigator, who must be selected from a pool of qualified, appropriately trained faculty members [pg. 8],

**(4)** once the investigation is completed, the investigator and faculty co-investigator must compile a written investigative report, which shall include – the scope of the investigation; a summary of the report's findings; proposed recommendations on corrective actions, sanctions and/or discipline; and any non-punitive, preventive remedies for the complainant [pg. 9];

**b)** Review of Investigative Report –

**(1)** Prior to making a determination in relation to investigatory report findings and imposition of any sanctions or discipline on the faculty respondent, the dean of the school having direct supervision of the faculty respondent is required to provide copies of the final investigative report to the complainant and faculty respondent, allowing each party ten (10) working days in which to submit written comments to the reviewing dean. Thereafter, the reviewing dean will make a determination to accept, modify or reject the investigative report's finding of responsibility or recommended sanctions, in whole or part. The dean is then required to make a final written determination, and to issue this to both the complainant and faculty respondent at the same time [pp. 9, 10];

[19]

**c)** Appeal by Faculty Respondent From a Finding of Responsibility by the Reviewer –

    **(1)** <u>To the Dean or Equivalent Unit Head</u>. If the faculty respondent objects to the reviewer's findings and does not allege that the circumstances giving rise to the purported Title IX violation arose out of a supervisory relationship between the faculty respondent and student complainant, then the faculty respondent may seek appellate review from the appropriate dean or unit head within ten (10) days of receiving the reviewer's determination [pg. 11],

    **(2)** <u>To the Committee on Academic Freedom and Professional Status of the Faculty</u>

        **[a]** If the faculty respondent objects to the Reviewer's findings and does allege that circumstances giving rise to the purported Title IX violation arose out of a supervisory relationship between the faculty respondent and student complainant, then the faculty respondent may seek appellate review from the Committee on Academic Freedom and Professional Status of the Faculty ("Faculty Committee"), within ten (10) days of receiving the reviewer's determinations [pg. 11];

        **[b]** Once the appeal is lodged with the Faculty Committee, that body will have a period of ten (10) days to make a jurisdictional determination of whether the purported Title IX violation occurred within a supervisory-subordinate-relationship [pg. 11];

        **[c]** If the Faculty Committee decides, by majority vote of its members, that the purported Title IX violation did not arise in that context, they have no further responsibility and the appeal will be dismissed and the finding of responsibility and

[20]

sanctions will become final [pg. 11];

**[d]** Conversely, if the Faculty Committee determines, by majority vote, that the alleged Title IX violation did arise out of supervisory-subordinate relationship, then the investigative report and reviewer's findings will be considered *de novo* in accord with the Faculty Procedures set forth in Appendix A, (found at pp. 13 et seq.) Significant in this regard is the standard of review to be utilized by the committee in conducting the *de novo* review, viz. 'clear and convincing evidence' [pg. 11].

### C. The Prevailing Climate at Defendant's Ithaca Campus
(At or Prior to Jane Doe's Complaint Filing)

**1. Defendant's Public Statements on Title IX and the Rise of Sexual Assault Cases**

**54.** In a 'Written Statement of Cornell University by Susan H. Murphy (Vice President of Student and Academic Services) and Mary G. Opperman, (Vice President, Human Resources and Safety Services) to the Roundtable Discussion on Campus Sexual Assault (hosted by Senators Claire McCaskill, Kirsten Gillibrand and Richard Blumenthal)' on June 23, 2014, the authors made the following remarks:

**a)** "[C]ornell University recognizes sexual violence as a serious campus and public health issue that affects every member or our community. It deserves the thoughtful attention of policymakers, and we commend you for the comprehensive approach that you are taking through your survey and this series of roundtables.";

**b)** "[S]exual violence, including rape, occurs with disturbing frequency in society and on campuses across the country. At Cornell, we believe that sexual violence must not be tolerated, and have a long history of leadership regarding sexual assault prevention and response. Not quite a year ago, Cornell announced substantial revisions, informed by the Department of Education's 2011 Dear Colleague Letter, to the University's

[21]

policies that address sexual assault and harassment. Under the revised Policy 6.4, sexual assaults involving students are no longer adjudicated under the adversarial hearing-based process of our Campus Code of Conduct. Instead, sexual assault complaints are investigated by a neutral fact-finder, sometimes working with a co-investigator. Final determinations and sanctions are made by a panel of reviewers, using a preponderance of the evidence as the standard of proof.";

c) "[W]e commend the White House Task Force for taking a giant step toward transparency with the launch of NotAlone.gov. This website makes Title IX enforcement data (including resolution letters and agreements) public and includes a step-by-step guide for filing a Title IX complaint with the Office of Civil Rights and Department of Justice. We believe that this guidance – along with increased media attention – will increase the number of Title IX suits filed against campuses …"; and

d) "[C]ornell university does not tolerate sexual abuse, rape, sexual assault, domestic violence, intimate partner violence, stalking, sexual coercion, or other forms of sexual violence by or against students, staff, faculty, alumni or visitors. We share the responsibility for creating a safer, more caring campus culture in which bias, harassment and violence have no place."

55. On September 21, 2015, in a statement to the Cornell University community, then president

Elizabeth Garrett delivered these comments in relation to The Association of American

Universities' Campus Climate Survey of Sexual Assault & Sexual Misconduct':

"[E]arlier today, the Association of American Universities, of which Cornell is a founding member, released the results of a campus sexual assault climate survey in which Cornell and 26 other universities participated. The aggregate report, as well as the Cornell-specific report, from 19% of our students who participated in the survey, reinforce what we have known, and what we have been working to address for many years: that student sexual assault is a serious national problem, occurring with unacceptable frequency at Cornell and on campuses across the country. The results also underscore there is still more work to be done to educate and to help protect our students. Even one instance of sexual assault on our campus is one too many. …

My paramount priority as Cornell president is the safety of our students, staff and faculty. We do not tolerate sexual violence against students, staff, faculty, alumni or visitors. Our community is committed to creating a safer, more caring campus culture in which bias, harassment, and violence have no place. The AAU survey reminds us that our work continues."

[22]

**2. News Articles on Defendant's Failure to Properly Address Policy 6.4 & Title IX**

**56.** In a December 2, 2015 article in <u>The Cornell Daily Sun</u>, dated December 2, 2015, the

following excerpts on Cornell's shortcomings on this topic were noted:

> "[At the conclusion of the 2014-2015 academic year, Amanda Minijus, J.D. '15,
> who was ending her one-year term as JCC (judicial codes counselor), released
> the first ever JCC Annual Report. In it, she alleged that the J.A. office, understaffed
> and overloaded with cases, was mismanaging investigations, underreporting its
> numbers and interpreting University codes in a way that reduced students' rights."

**57.** On April 7, 2016 <u>The Cornell Chronicle</u> reported on "sexual assault awareness" in scheduled

April 11-15, 2016 on-campus events. Relevant excerpts from this piece include:

> "[K]ate Harding, author of 'Asking for It: The Alarming Rise of Rape Culture –
> and What We Can Do About It' will speak Monday, April 11 at 6 p.m. in
> Kennedy Hall's Call Alumni Auditorium. Her talk is part of Cornell's second
> Annual Sexual Assault Awareness Week, organized entirely by students, in
> collaboration with staff from Student and Campus Life. … The title of Harding's
> book confronts one of the persistent myths about rape, that women who are
> raped must have consciously or subconsciously 'asked for it'. Harding also
> writes about the ways in which rape is persistent in American culture, the
> differences between rape and consensual sex, and the misguided attitude
> that 'boys will be boys' and it is the girl's responsibility to say 'no'. The series
> of events builds each day to address the campus climate, who's at risk, any
> gaps in current policies and how we can create a better, safer environment, says
> Kendall Grant, one of the student organizers of Sexual Assault Awareness
> Week and former president of the Panhellenic Council."

**58.** In response to continuing claims of ineffectual and/or tardy investigations into allegations of

sexual misconduct and violence against women, defendant created the Office of the Title IX

Coordinator. As reported by <u>The Cornell Chronicle</u> in an August 31, 2016 story:

> "[T]his past spring, Cornell created an Office of the Title IX Coordinator
> dedicated solely to Title IX concerns, furthering a long-standing commitment
> to promoting a safe and nondiscriminatory environment for all members of

the Cornell community, in which incidents of sexual misconduct have no
place. These incidents include any occurrence of gender-based harassment,
sexual harassment, sexual assault, domestic and dating violence, stalking,
sexual exploitation or other forms of sexual misconduct committed by or
against students, staff or faculty. ... The Title IX coordinator oversees the
university's compliance with Title IX, New York State Education Law
Article 129-B, and related federal and state laws and regulations; its
ongoing education and primary prevention efforts; its investigation, response
and resolution of all reports of sexual and related misconduct under university
Policy 6.4; and its efforts to eliminate sexual misconduct, prevent its
recurrence and remedy its effects."

59. In a March 2, 2017 piece entitled 'OCR Open Forum Regarding University's Title IX

Office', The Cornell Daily Sun reported:

"[On Tuesday and Wednesday, four attorneys from the Department of
Education's New York Office for Civil Rights held open focus groups
during which members of the public could discuss the campus climate
surrounding sexual assault and harassment. The Sun attended one of these
three meetings. ... The public comments of the few, who attended the
event: 'it's bad'. Of the six open investigations against Cornell, most are
to determine whether the University responded 'promptly and equitably'
to sexual assault complaints. At least one of these investigations is to
determine whether the University discriminated against a party to a sexual
assault investigation on the basis of sex. Attendees disapproved of the
University's treatment of both parties in the Title IX investigations. From
the perspective of the complainant, a number of participants said that the
Title IX office cares more about avoiding litigation than it does about
seeking justice. Some attendees said that in their experience, the Title IX
office looked out for the University's interest rather than that of the
complainant. Instead of offering the complainant several legal avenues
to handle the complaint, the attendees said the Title IX office tried to keep the
complaint internal and quiet. ..."

60. In a March 29, 2017 follow-up article, entitled 'Details of Alleged Title IX Violations at

Cornell Emerge Amid 6 Active Inquiries', The Cornell Daily Sun found:

"[F]or more than two months, the U.S. Department of Education's Office for

Civil Rights has been investigating Cornell for six unique allegations of Title
IX violations – more than any of the 228 postsecondary institutions under
investigation as of Wednesday. … The most recent investigation is into an
allegation that Cornell did not respond quickly enough or equitably to the
complainant based on the complainant's sex. … The Education Department's
Office for Civil Rights is investigating 317 cases at 228 postsecondary
Institutions relating to title IX, as of Wednesday, and Cornell is the only
University with six active inquiries."

**61.** Reporting by The Cornell Chronicle, in an October 24, 2017 article entitled 'Students More

Aware of Resources, But Sexual Assault, Harassment Continue', revealed:

"[A] recent Cornell survey of undergraduate, graduate and professional students
found students are more aware of resources available to them and actions they
can take to prevent or intervene in sexual harassment and nonconsensual sexual
contact than they were a couple of years ago. However, the number and character
of incidents of sexual harassment or assault, … remain high. 'Sexual assault and
related misconduct – including sexual and gender-based harassment, dating and
domestic violence and stalking – is a serious problem, occurring with unacceptable
frequency on campuses across the country, including our own', wrote Ryan
Lombardi, vice president for student and campus life, Mary Opperman, vice
president and chief human resources officer, and Dr. Dana Zappetti, associate
dean of student affairs at Weill Cornell Medicine, in a recent message to the Cornell
community. Among key findings, the 2017 Cornell Survey of Sexual Assault and
Related Misconduct found 55% of respondents said they had experienced one or
more forms of harassment, and 11% of students experienced nonconsensual sexual
contact as a result of physical force, threats of physical force or incapacitation since
attending Cornell. Calling the survey statistics 'disturbing', Lombardi, Opperman and
Zappetti wrote that as a community, 'we can and will do more to create a climate
where everyone is safe, respected an has access to appropriate support resources.' "

**62.** In an April 15, 2018 article entitled 'Fourth Cornell Sexual Assault Awareness Week to

Restore Survivors' Agency', The Cornell Daily Sun observed:

"[T]he fourth Cornell Sexual Assault Awareness Week, which will take place
from April 16 to April 20, hopes to help sexual assault victims find their
voices and bring to the table the concerns around the issue. … Alexandria Klein,
event organizer of the awareness week, said that many Cornell students who
grapple with the issue find it hard to express their thoughts and that this week

[25]

is a 'powerful chance' for them. One of the featured events is the Whiteboard Photograph Campaign. Inspired by Duke University's 'Duke Breaking Out Project', the campaign has been collecting anonymous quotes from sexual assault survivors at Cornell through an online survey form since February, according to the committee's website. Other events during the week include a display of clothing that survivors reported wearing during the incidents, which will take place at the Tammany Lounge at Risley Residential College and Mann Library atrium, as well as a 'Call for Action' forum on Friday, which will give participants a chance to voice opinions on related topics such as education and support services."

63. In an April 16, 2018 article on Chantelle Cleary's appointment as the new title IX

coordinator at defendant, The Cornell Daily Sun reported:

"[C]hantelle Cleary, who will be joining the University as the new Title IX coordinator in June, outlined her objectives and emphasized her desire to work with the Cornell community to address and prevent sexual and interpersonal violence in an interview with The Sun. … When asked if her experience as a prosecutor might suggest that she will be partial toward reporting students over accused students, Cleary responded, 'fairness has always been important to me.' …When asked if she thought there was a rape culture at Cornell, Cleary said that was something she would need to learn more about once she actually gets to campus. 'I think there is a rape culture in our society, generally. Whether or not or how deeply ingrained that culture is at Cornell, I'm not clear about [Cornell's culture] yet because I'm not there yet, but that's one of the things I might want to talk to folks about when I get there.' "

64. In an opinion piece about the installation of Chantelle Cleary as defendant's new Title IX

coordinator, The College Fix, on April 17, 2018 wrote in pertinent part:

"[Cornell University is getting a new title IX coordinator in June, giving the Ivy League school a chance to start fresh after years of bad headlines on Title IX. … Into this Dumpster Fire steps Chantelle Cleary and what she hopes to accomplish at Cornell. What jumped out to KC Johnson of Brooklyn College, co-author of The Campus Rape Frenzy … Cleary's fanciful claim that Cornell's policies are 'very robust and transparent and fair.' … It's not obvious that Cleary (in response to questions on which

standard should be applied at Cornell following the rescission of the 2011
DCL, preponderance of evidence or clear and convincing evidence) actually
knew that because switching to a higher evidence standard would almost
certainly provoke crippling protests by rape-culture activists at Cornell who
would accuse the new Title IX coordinator of scorning 'survivors' and
promoting rape culture. This would probably cow Cleary into compliance
with their agenda, since she explicitly tells The Sun that she believes rape
culture exists 'in our society, generally', even if she's not familiar with
culture at Cornell yet."

**65.** In response to DOE's release of proposed, new Title IX rules in November 2018, Cornell

Student Assembly Resolution #19 ('In Opposition to the Department of Education's Proposed

Title IX Changes') was submitted to that body on November 29, 2018. A copy of this resolution

is annexed hereto and designated **Exhibit "B"**.

**66.** In an interview with The Cornell Sun (published December 4, 2018) following release by

DOE of proposed, new rules governing Title IX investigations and adjudications in November

2018, Chantelle Cleary commented: "[U]ntil we have final regulations, it's just not appropriate

to say what's going to happen, Cleary said. ... What I can say is that these regulations set a floor,

and not a ceiling. And, so if the regulations change the definition of sexual harassment, for

example, that does not mean that Cornell has to alter ... our definition of sexual harassment."

**67.** In a January 29, 2019 release, local radio station WRFI News reported:

"[S]tudents at Cornell in their own letters are urging the Department of
Education to withdraw the proposed changes to Title IX procedures.
Students have protested Cornell's handling of sexual assault since 2012,
coupled with steps by the college to overhaul its policies. The Cornell
Daily Sun reported that the school had the highest number of reported
sexual assault incidents among New York State colleges in 2018.
Students wrote their own comments at a letter writing event on Friday.
Some carried personal experience of sexual violence and the emotional
challenges of reporting them. Ekarina Winarto said the changes might

[27]

discourage those dealing with sexual harassment to pursue a hearing through the Title IX Office. 'Personally, I think that some of the proposed changes would dissuade victims from actually coming forward', Winarto said. 'So if the purpose is to encourage victims to come forward, I don't necessarily think that these are really the changes that you would want to see.' … Alice Navadeh said the new regulations would worsen the low sexual assault reporting rates on college campuses, citing statistics from a study by the National Sexual Violence Resource Center. 'I think that these new changes are appalling', Navadeh said. 'One in five women will be sexually assaulted on college campuses, and one in 16 men will be sexually assaulted on college campuses. Already 90% of survivors don't report. It's still traumatic for survivors to have to go through that process, but it's not as traumatic because it's not as long and the standard of proof is lower.' "

**68.** Finally, in a letter to the editor of <u>The Cornell Daily Sun</u> entitled "A Call to Action After Sexual Assault Awareness Week", published May 2, 2019, two current students (Lavanya Aprameya '19, President Emeritus, <u>Haven</u> and Marissa Block '19, Student Assistant to the Dean of the Hotel School) and one former student (Luke Bianco '18, President Emeritus, <u>Consent Ed</u>) wrote:

> "[C]ornell is challenging in many ways that it should be - academically, professionally, socially - yet when a quarter of undergraduate women … and seven percent of undergraduate men are experiencing sexual assault after arriving on campus, these challenges are compounded to an unacceptable level. This week concludes the fifth annual installment of Sexual Assault Awareness Week at Cornell. Throughout this week, we, the planning board of SAAW, have strived to bring members of the Cornell community together to discuss the impact of sexual violence on our campus and beyond. These conversations were meaningful, educational and supremely important…. After diligently reflecting on the conversations and lessons learned from our week of events, we call the community to action by setting the following goals:
>
> ● We must broaden the scope of the types of sexual violence we actively validate. Individuals coming forward about sexual assault should be believed and taken seriously …

[28]

- We must broaden the scope of the victims and survivors we believe. As a
  society, we rarely believe the experiences of victims and survivors of
  sexual violence, even in cases that fall within our narrow white, cisgender,
  heterosexual image of what sexual violence looks like. … We must
  condition ourselves to believe rather than doubt all of those who come
  forward about their experiences with sexual violence

- We must continue to identify and rally against language and behavior that
  enables sexual violence. …

To Cornell's administration, we call you to act on the following:

- We call on Cornell University officials to publicly announce their intention to
  maintain the current procedural rules in place on our campus, outlined on the
  Title IX website. Specifically, Cornell should publicly make a commitment to
  reject Devos' calls for cross-examination as part of the Title IX adjudication
  process. …

- We call on the University to both promote the services of the confidential
  victim advocates and hire additional staff members from diverse backgrounds.
  … The victim advocates provide a critical service. The University should
  commit to expanding it….

- Leaders of student organizations are frequently made aware of incidents of
  sexual violence among their peers, and they often lack the knowledge to
  adequately address these situations with grace and nuance. … We call on
  the University to make a good faith effort to legitimately train student
  leaders to respond to, support and assist their fellow classmates in
  navigating the reporting process and the aftermath of violence. …"

### 3 DOE/OCR Title IX Investigations Pending Against Cornell University in 2019

**69.** According to information provided by the DOE/OCR website, as January 1, 2019 defendant

had ten (10) active OCR Title IX investigations pending and unresolved against it, the most of

any college or university in the United States.

**70.** According to information provided by the DOE/OCR website, as of June 3, 2022 defendant

had twelve (12) active OCR Title IX investigations pending and unresolved against it - tying

[29]

it with the University of Alabama for the dubious distinction of having the most pending OCR

Title IX investigations of any college or university in the United States.

### 4. 2019 Cornell Survey of Sexual Assault and Related Misconduct

**71.** In the spring of 2019 defendant, in accordance with the requirements of NYS Education Law

§6445 ("Enough is Enough Law"), the university published the '2019 Cornell Survey of Sexual

Assault and Related Misconduct'. The Survey asked students about their experiences with

inappropriate sexual behavior while attending Cornell, including – non-consensual sexual

contact, sexual and gender-based harassment, stalking and other domestic and dating violence.

**72.** As relevant and material, the report disclosed the following data:

- 6000 students were invited to participate, of these some 2,247 completed the survey,
a response rate of 37%;

- during the 2018-2019 academic year, 11.9 % of undergraduate women reported an
incident(s) of sexual touching;

- during their attendance at Cornell, some 25.0% of undergraduate women reported an
incident(s) of sexual touching;

- during their attendance at Cornell, some 24.2% of heterosexual, undergraduate women
reported an incident(s) of non-consensual sexual contact; and

- during their attendance at Cornell, undergraduate women reported an incident(s) of
non-consensual sexual touching - by force (19.3%); by incapacitation (10.7%); by
coercion (0.8%); and by absence of affirmative consent (30.7%).

**73.** In an October 16, 2019 press release to faculty and staff at Cornell regarding the 2019

Survey, Ryan Lombardi (Vice President for Student and Campus Life), Mary Opperman

(Vice President and Chief Human Resources Officer), Dana Zappetti, M.D. (Associate Dean

[30]

of Student Affairs, Weill Cornell Medical College) and Ranid Silver, PhD. (Associate Dean

of Academic Affairs, Weill Cornell Graduate School of Medical Sciences) wrote:

> "[S]ince 2015 Cornell has conducted a survey every two years to measure
> students' knowledge of the university's policies, procedures and resources,
> as well as their Cornell experiences, related to sexual assault, sexual and
> gender-based harassment, stalking and dating and domestic violence. Today,
> as we release the findings of our third such survey, it is important for all of
> us to acknowledge that our community still has considerable work to do to
> become a safer, more respectful environment where all students can thrive. …
>
> No university campus, including ours, is isolated from these societal
> challenges. Increased education and prevention programming, along with
> national conversations surrounding title IX and the #Me Too movement,
> have elevated the conversation about what is and is not acceptable behavior."

### 5. Office of Institutional Equity & Title IX – Cornell Policy 6.4 Complaints Against Students, Staff and Faculty in the 2018-2019 Academic Year

**74.** As relevant and material, the report cited the following statistics on reports of alleged Policy

6.4 violations, and actions by the Title IX Office in respect to these. These statistics included

reports against both student and faculty respondents. (Prior to June 1, 2019, reports and formal

complaints against faculty and staff for alleged violations of Policy 6.4 were made to the Office

of Workforce Policy and Labor Relations.) The 366 reports received were, in part, categorized as

follows:

- 53 reports of dating and domestic violence;

- 124 reports of harassment (including sexual and gender-based harassment);

- 135 reports of sexual assault; and

- 33 reports of sexual exploitation.

**75.** As a consequence of these filings some 27 formal complaints were generated and

formal investigations undertaken. Broken down by respondent status, investigations

were initiated against: 15 undergraduate students; 8 graduate/professional students; and

4 faculty/staff, with the overwhelming number of named respondents, males.

### D. Trauma-Informed Technique in Title IX Investigations

**76.** '**Not Alone**' was the April 2014 first report of the White House Task Force to Protect

Students From Sexual Assault. The White House Task force was co-chaired by the Vice

President's Office and The White House Council on Women and Girls.

**77.** As relevant and material, the genesis for 'Not Alone', was the fact that:

> "[O]ne is five women is sexually assaulted in college. ... The President
> created the Task Force to Protect Students from Sexual Assault to
> turn this tide. ... we are here to tell sexual assault survivors that they
> are not alone. And we're also here to help schools live up to their
> obligation to protect students from sexual violence. Today, we offer
> our first set of action steps and recommendations: ...
>
> **Trauma-Informed Training for School Officials**.
> Sexual assault is a unique crime: unlike other crimes, victims often blame
> themselves; the associated trauma can leave their memories fragmented;
> and insensitive or judgmental questions can compound a victim's distress.
> Starting this year, the Justice department, through both its Center for Campus
> Public Safety and Is Office on Violence Against Women, will develop trauma
> informed training programs for school officials and campus and local law
> enforcement."

**78.** In a recent U.S. Dept. of Justice (Office of Violence Against Women) abstract, the trauma

informed approach involving sexual assault investigations perpetrated against women was

discussed in these terms:

> "[T]rauma occurs when a person is overwhelmed by events or circumstances
> and responds with intense fear, horror, and helplessness. Extreme stress often
> overwhelms the person's capacity to cope. ... The impact of trauma can be

subtle, insidious, or outright destructive. … inconsistent statements and lack
of core details should be expected. These are not signs of deception – these are
biological reactions to trauma. In fact, suspects are usually much more believable
because they are not suffering the effects of trauma and can weave a convincing
account of their own blamelessness. …"

**79**. Under the trauma based investigative paradigm: the victim of sexual assault is to be believed;

her account of the sexual assault (even though it may be rife with inconsistencies) should be

validated; and the respondent *prima facie* presumed guilty.

**80**. In an August 16, 2019 "Position Statement" on Trauma-Informed Training and Neurobiology

of Trauma, the Association of Title IX Administrators ("ATIXA") candidly made the following

statements to its membership:

● "ATIXA wishes to reiterate the value of being trauma-informed in our sexual
misconduct interview techniques, but encourages our members and field to avoid
the use of information on the neurobiology of trauma to substitute for evidence.

● ATIXA knows that sexual trauma is a controversial topic, and that our position on it is
controversial as well. … We do worry that application of the knowledge obtained by
practitioners in our field has gotten way ahead of the actual science, that the body of
knowledge is being misapplied, and that some purveyors of this knowledge are politically
motivated to extrapolate well beyond any reasonable empirical conclusions currently
supported by science.

● The field needs to incorporate trauma-informed investigation and interviewing methods
into its best practices, provided that they do not compromise the ability to obtain credible,
relevant evidence; however, the 'Neurobiology of Trauma" should not significantly influence
the way that colleges and schools evaluate evidence.

● The field of those who do Title IX-related work has, to some extent, gotten ahead of the
science. A corrective, collective step-back is needed. So, where does that leave us? It
leaves us being trauma-informed in our investigations without allowing trauma to unduly
influence our interpretation of evidence

● Trauma can impact consistency. Recognizing that an incident may have
triggered a trauma-based response makes the inconsistency understandable,

[33]

but it does not excuse the inconsistency. Put succinctly, the presence of trauma
is not a substitute for the absence of evidence. ... Missing information should
not be held against someone, if it is missing as the result of trauma, but trauma
itself does not provide a rationale for bolstering credibility in the absence of
evidence. This should not be viewed as a value judgment, or as victim-blaming;
it is an unbiased assessment of the consistency of the information."

**81.** In its January 15, 2021 discussion of Bias, Conflicts of Interest and Trauma-Informed

Practices, the OCR stated by way of further guidance:

"[W]ith respect to trauma-informed techniques generally, ... (these) practices
can be implemented as part of an impartial, unbiased system that does not rely
on sex stereotypes and otherwise complies with the Title IX regulations, but
that doing so requires taking care not to permit general information about the
neurobiology of trauma to lead title IX personnel to apply generalizations to
allegations in specific cases. In that vein, schools have the discretion to train
Title IX personnel in trauma-informed practices ... so long as such an approach
or training is consistent with the regulations ... which require recipients to train
title IX personnel to serve impartially, without prejudging the facts at issue and
using materials free from reliance on sex stereotypes."

## II. SPECIFIC FACTS RELATING TO THE INVESTIGATION AND ADJUDICATION OF JANE DOE'S COMPLAINT AGAINST PLAINTIFF

### A. The Procedural History of the Proceeding

**82.** On March 16, 2019 an online incident report was made by a faculty member of the Hotel

School, on behalf of complainant Jane Doe, relative to an alleged violation of Policy 6.4 by

plaintiff. The purported incident occurred on the evening of March 15, 2019 at an on-campus

social/dinner event at the Hotel School ("HEC event")

**83.** After receiving the incident report Deputy Title IX Coordinator/Chief Investigator

Lauren Branchini contacted Jane Doe and scheduled an in-person interview, which transpired

in defendant's Title IX office on March 27, 2019. Annexed hereto and designated **Exhibit "C"**

[34]

is a copy the redacted transcript of Jane Doe's "Complainant Interview" with Ms. Branchini, together with a "Transcript Review Form".

**84.** Following her interview of March 27, 2019 with Ms. Branchini, a formal complaint was signed by Jane Doe on April 15, 2019, alleging plaintiff violated Policy 6.4.

**85.** On April 23, 2019 the Title IX office, via letter, contacted plaintiff and advised of the filing of a formal complaint against him by Jane Doe and the pendency of an investigation into her allegations. Annexed hereto and designated **Exhibit "D"** is a copy of the notification letter with attachments, including the complaint form signed by Jane Doe, separately identified as **Exhibit "E"**.

**86.** The informational document attached to the April 23, 2019 letter ("Complainant's and Respondent's Written Guide to Rights, Options, and the Process for the Resolution of Reports Against Students") was defective and confusing, as it pertained to Policy 6.4 complaints against students, and not faculty members. Notwithstanding this error, no corrective informational packet was provided to plaintiff.

**87.** On April 23, 2019, the same day defendant's Title IX office first sent plaintiff its notification letter, plaintiff was summoned to the Title IX office for a "Respondent Intake" interview. Plaintiff was not given any choice by the Title IX office, but to attend.

**88.** In fact, plaintiff did meet with Chantelle Cleary, defendant's Title IX Coordinator, on April 23, 2019 without an attorney or Judicial Codes Counselor from Cornell Law School.

**89.** At the time of the of the April 23, 2019 meeting ("first intake interview"), plaintiff was not provided with a copy of Jane Doe's formal complaint. As material and relevant, during this

[35]

initial interview Ms. Cleary advised plaintiff that Kate Walsh, Dean of the Hotel School, would

be the designated reviewer of the investigative report. (see - pp. 9, 14 of the transcript of

plaintiff's first intake interview, a redacted copy of which is annexed hereto and designated

**Exhibit "F".**)

**90.** Subsequently, the Title IX office contacted plaintiff and requested that he attend a second

interview at their office on May 14, 2019 ("second intake interview"). In fact, plaintiff did

attend the second intake interview without an attorney or Judicial Codes Counselor present.

**91.** At the second intake interview, Ms. Cleary and faculty co-investigator Stedinger were

both present and participated in the interview. Annexed hereto and designated **Exhibit "G"**

is a copy of the redacted transcript of the second intake interview, together with the June 6, 2019

Respondent Transcript Review Form.

**92.** As material and relevant, during the second intake interview: Ms. Cleary advised plaintiff

that she would obtain videos from the Hotel Ezra Cornell ("HEC") cocktail and dinner event,

which transpired on March 15, 2019 (see – pp. 23, 26 and 28); and Ms. Cleary told plaintiff that

she had already interviewed some witnesses (see - pg. 23). For his part, plaintiff told Ms. Cleary

and Professor Stedinger that he was an informal advisor at the HEC event. (see – pg. 24)

**93.** On June 25, 2019 plaintiff met with Lead Title IX Investigator Cleary, Title IX Co-

Investigator Vanessa Bentley and Faculty Co-Investigator Stedinger for a formal Respondent

Interview ("formal interview"). At that time plaintiff's Judicial Codes Counselor, Gabrielle

Kanter, was present via remote hookup from New York City, which afforded her only sound

monitoring of the interview, and not video, because of connectivity problems at the law office

[36]

Ms. Kanter was then working. Annexed hereto and designated **Exhibit "H"** is a redacted

copy of plaintiff's formal interview, along with the July 26, 2019 Investigation Transcript

Review Form.

**94.** As material and relevant, during the formal interview: plaintiff reiterated that he was at the

HEC event as an informal advisor, monitoring students and guests (see- pp. 41, 42); and as to

the applicability of Policy 6.4, (the version in effect which is exemplified in Exhibit "A"), this

was the policy actually used in plaintiff's case, which did not afford a hearing on the evidence

gathered by the investigators. According to Chief Title IX investigator Cleary, a change in

procedures occurred as of June 1, 2019 which thereafter granted faculty respondents a full

hearing on a complainant's charges. (see – pp. 52, 53)

**95.** On July 3, 2019 Jane Doe's formal interview was had at the defendant's Title IX office.

Present at this interview were Lead Title IX Investigator Cleary, Co-Investigator Bentley and

Faculty Co-Investigator Stedinger. Annexed hereto and designated **Exhibit "I"** is a redacted

copy of Jane Doe's formal interview.

**96.** As material and relevant, Jane Doe stated that the alleged sexual touching occurred while

she, plaintiff, chef Anthony Vesco, chef Christian Latimer and alumnus Sophia Lin Kanno were

in a relatively close circle, 'like some distance between shoulders.', according to Jane Doe. (see

– pp. 61, 66, 67)

**97.** Prior to Jane Doe's formal interview, the interview of alumnus Sophia Lin Kanno took

place on May 17, 2019 at defendant's Title IX offices, with Ms. Kanno testifying remotely.

Annexed hereto and designated **Exhibit "J"** is a redacted copy of Ms. Kanno's interview with

[37]

Lead Title IX Investigator Cleary, co-Investigator Bentley and faculty co-Investigator Stedinger.

**98.** As material and relevant, Ms. Kanno advised the investigators that not only did she speak with Jane Doe at the HEC event on Friday, March 15, 2019, but also during the course of the HEC event on Saturday, March 16, 2019 and on Sunday morning, March 17, 2019. The Investigators asked only a few, general questions on the nature of the conversations with Jane Doe on those subsequent dates. No specific questions were asked of Ms. Kanno about Jane Doe's demeanor, or any observations she made of Jane Doe's physical appearance or mental affect on either Saturday or Sunday, following the alleged incident. (see – pp. 73, 75 and 76).

**99.** On May 9, 2019 Chef Christian Latimer was interviewed as a witness at defendant's Title IX offices. Present for this interview were Chief Title IX Investigator Cleary and Faculty Co-Investigator Stedinger. A redacted copy of Chef Latimer's interview is annexed hereto and designated **Exhibit "K"**.

**100.** As material and relevant, Chef Latimer stated that he did not engage any student when he and his wife were speaking with plaintiff at the HEC event on Friday, March 15, 2019, directly contradicting Jane Doe's account of who was present at the alleged incident. (see - pp. 88, 89)

**101.** On May 9, 2019 Douglass Miller, an Instructor at the Hotel School, was interviewed as a witness at defendant's Title IX offices. Present for this interview were Chief Title IX Investigator Cleary and Faculty Co-Investigator Stedinger. A redacted copy of Mr. Miller's interview is annexed hereto and designated **Exhibit "L"**

**102.** As material and relevant, Mr. Miller stated that: he did not witness plaintiff interact

[38]

with Jane Doe at any time during the HEC event on March 15, 2019 (see- pg. 95); he did see

plaintiff interact with numerous alumni and other students at that time, which he described as

"very engaging" (see – pg. 95); he did not remember seeing plaintiff hug any students at that

time (see – pg. 97); and any physical contact he did observe was 'mutual' hugging with alumni

(see – pg. 97). In general, when asked about plaintiff's interactions with students, Mr. Miller

described these in terms of "caring", "insightful" and "very much professional". (see - pg. 96).

**103.** On May 9, 2019, Sarah Monahan, a senior at the Hotel School, was interviewed as a witness

at defendant's Title IX offices. Present at the interview were Chief Title IX Investigator Cleary

and Faculty Co-Investigator Stedinger. A redacted copy of Ms. Monahan's interview and

Transcript Review Form, is annexed hereto and designated **Exhibit "M"**.

**104.** As material and relevant, Ms. Monahan did not see plaintiff at the HEC event on Friday but

did see him on Saturday, March 16, 2019, when she introduced plaintiff to her parents and ate

lunch with him and her friends. (see – pg. 109). At no time during the HEC event did Ms.

Monahan see Jane Doe interact with plaintiff. (see – pg. 110)

**105.** On May 7, 2019 Heather Kolakowski, an Instructor at the Hotel School, was interviewed as

a witness at defendant's Title IX offices. Present at the interview were Chief Title IX

Investigator Cleary and Faculty Co-Investigator Stedinger. A redacted copy of Ms. Kolakowski's

Interview and Transcript Review Form are annexed hereto and designated **Exhibit "N"**.

**106.** As material and relevant, Ms. Kolakowski reported that: Jane Doe stated at the time of the

incident, Chef Antonio Vesco was there with others, whom she could not recall (see - pp. 120,

124); there were pictures of the HEC event, which might prove useful in the investigation (see –

[39]

pg. 124); after the alleged incident Jane Doe spoke with a former student, Francesca Phlippini

sic ("Filippini"), about what allegedly happened. In response Ms. Filippini expressed disbelief

that plaintiff had touched Jane Doe in a sexual manner (see – pg. 125); and Ms. Kolakowski

could not imagine plaintiff touching someone inappropriately and intentionally. (see – pg. 126)

**107.** On July 17, 2019, Michelle Lin, a student in the hotel school and close friend of Jane Doe,

was interviewed by Lead Title IX Investigator Cleary, Co-Investigator Bentley and Faculty Co-

Investigator Stedinger. Ms. Lin's witness interview was conducted remotely. A redacted copy of

Ms. Lin's interview is annexed hereto and designated **Exhibit "O"**.

**108.** As material and relevant, Ms. Lin stated that: Jane Doe told her the alleged sexual touching

took place in a dark room during the HEC event (see – pg. 132); Ms. Lin and Jane Doe were

close friends at the time of the alleged incident (see – pg. 132); prior to the alleged incident,

interactions between Jane Doe and plaintiff had always been friendly (see – pg. 133); and that

Ms. Lin did not attend the HEC event and could not testify as to what happened - aside from

what Jane Doe related to her about the incident. (see – pg. 134)

**109.** Ms. Lin was the final individual interviewed by defendant's Title IX office.

**110.** Appendix A to the Final Investigative Record (Statements) consisted of the following

exhibits, which are appended to this complaint, viz: Exhibits **"C" – "O"**, inclusive.

**111.** On or about November 8, 2019 the Title IX Office completed its Investigative Report.

A copy of this report is annexed and designated **Exhibit "P"**. The report concluded that

plaintiff was responsible for a violation of Policy 6.4 and sanctions were recommended.

**112.** On or after November 11, 2019 the Investigative Report was distributed to, *inter alia*

[40]

Jane Doe and plaintiff, by mail.

113. In opposition to the Final Investigative Report, plaintiff submitted a responsive statement to Dean Hallock, who undertook the responsibility of reviewer, as Kate Walsh (Dean of the Hotel School and designated reviewer pursuant to defendant's Policy 6.4) under pressure from Dean Hallock, ceded her role to him. Plaintiff timely submitted his objections to the Final Investigative Report on November 25, 2019. A copy of plaintiff's objections is annexed hereto and designated **Exhibit "Q".**

114. On or about December 6, 2019 Dean Hallock, having usurped the role of reviewer, found plaintiff responsible for a violation of Policy 6.4 and adopted the sanctions recommended by the Investigative Report. Annexed hereto and designated **Exhibit "R"** is a copy of Dean Hallock's determination.

115. Plaintiff timely appealed Dean Hallock's determination of responsibility and sanctions, in accord with the protocols set forth in Policy 6.4. A copy of plaintiff's appeal, sent to the Title IX Office, is annexed hereto and designated **Exhibit "S".**

116. Plaintiff's appeal was directed by the Title IX Office to Dean Hallock, who on December 13, 2019 denied plaintiff's appeal. Annexed hereto and designated **Exhibit "T"** is a copy of Dean Hallock's appeal adjudication letter.

117. Dean Hallock's December 13, 2019 denial of plaintiff's appeal was a final determination.

118. The complete record of defendant's Policy 6.4 Administrative Proceeding concerning Jane Doe's formal complaint against plaintiff consists of annexed Exhibits "C" – "T", inclusive.

[41]

## AS AND FOR A SOLE CAUSE OF ACTION AGAINST DEFENDANT FOR VIOLATION OF PLAINTIFF's RIGHTS UNDER TITLE IX
### (Erroneous Outcome)

**119.** Plaintiff repeats, as material and relevant, each of the allegations contained in paragraphs "1" – "118", inclusive.

**120.** Title IX of the Educational Amendments of 1972 prohibits discrimination on the basis of gender in educational programs and activities that receive federal funds. [¶ "36"]

**121.** Defendant received federal funding during the 2019 school year from DOE for its its educational programs and activities. [¶¶ "38", "39"]

**122.** During the investigation and adjudication of Jane Doe's complaint, defendant's Title IX office conducted a fatally flawed proceeding under Policy 6.4 against plaintiff which:

  **a)** was partial and slanted in favor of Jane Doe;

  **b)** was incomplete and failed to consider exculpatory evidence;

  **c)** wholly ignored inconsistencies in Jane Doe's various accounts of the incident;

  **d)** failed to afford plaintiff any due process rights;

  **e)** failed to properly apply the 'preponderance of evidence' standard in evaluating testimony;

  **f)** was untimely in light of OCR guidance;

  **g)** violated its own procedures regarding - the proper individual who would review the final investigative report (making a finding of responsibility and determining sanctions) and the proper body to hear plaintiff's appeal; and

  **h)** was motivated by gender bias, owing in large measure to tremendous campus pressure

[42]

on defendant to timely and aggressively pursue investigations against males who

sexually assault females on and off campus (i.e. the 'rape culture' which permeated the

campus), coupled to the pendency of ten (10) active OCR investigations against defendant as

of January 1, 2019.

**123.** As a consequence of these failings, omissions and student pressure prevailing on campus:

**a)** plaintiff was wrongfully found responsible of violating defendant's Policy 6.4, despite his

innocence. In short, plaintiff claims that the finding of responsibility and consequent

imposition of sanctions was the result of an 'erroneous outcome' based upon his gender;

**b)** defendant meted out sanctions to plaintiff which were unduly harsh and unjustified; and

**c)** defendant employed the wrong procedures in determining plaintiff's appeal, referring his

appeal back to the initial reviewer who, not surprisingly, upheld his initial decision.

**124.** In investigation and adjudication of complaints involving allegations of prohibited

conduct by a faculty member, "OCR guidance" mandated that the administrative proceeding be

**impartial and equitable**. [¶¶ "45 b), d)" and "50 a)"]

**125.** Defendant, in its investigation of Jane Doe's complaint by the Title IX office, did not act in

an impartial, equitable manner toward plaintiff for the following reasons:

**a)** the three, principal Title IX investigators involved in Jane Doe's complaint were female.

Further, each of these investigators had a background in law enforcement (two were former

district attorneys prosecuting sex crimes against women and children, while the third was

most recently a Cornell University Police Officer); [¶¶ "19", "28", "30"];

**b)** all three of the female Title IX investigators were steeped in the 'trauma informed

[43]

investigative' technique which (because of its premise that the female victim should be believed and any inconsistencies in her testimony downplayed or ignored), resulted in plaintiff having to prove his innocence from the outset of the investigatory process, rather than the investigators having to present proof, warranting a finding of responsibility, by a preponderance of the evidence; [¶¶ '17", "18", "27", "28" "31", "76" - "81"];

**c)** in an interview with the <u>The Cornell Sun</u>, published April 16, 2018 (prior to her installment as defendant's new Title IX Coordinator/Lead Investigator), Chantelle Cleary explicitly stated that she believed that a male 'rape culture' exists in our society generally. [¶ "63"];

**d)** in an opinion of the Appellate Division, Third Department (dated November 25, 2020), the majority of that Court castigated Chantelle Cleary for having "admittedly altered the facts as reported to her" as against a male respondent while the Title IX Coordinator and Lead Investigator at the State University of New York at Albany. This deliberate manipulation of reported evidence by Ms. Cleary resulted in a finding of responsibility against the accused student. [¶ "23"]; and

**e)** faculty co-investigator Stedinger, at various times when he was participating in interviews with witnesses, expressed obvious sympathy and support for the complainant's story and explanations of witnesses, which comments clearly evidenced bias and prejudice against plaintiff. (Exhibit "M", pp. 104, 111; Exhibit "N", pp. 119, 127, 129]

**126.** In investigations and adjudications of complaints involving allegations of prohibited conduct by a faculty member, OCR guidance required that investigative process be

**thorough and complete, taking into consideration exculpatory evidence. [¶¶ "45 d)(1)",**
"48 b)" and "50 c)"]

127. Defendant, in its investigation of Jane Doe's complaint by the Title IX office, was **neither**
**thorough nor complete** in the following respects, leading to a fatally flawed investigation:

**a)** the investigators and faculty co-investigator failed to follow up with evidence concerning

important interactions between Jane Doe and other unbiased witnesses, whom Jane Doe had

allegedly met with, both during and after the alleged March 15, 2019 incident.

Notwithstanding this fact, several key and highly relevant witnesses were not interviewed.

Because of these glaring failures important, independent testimony of these witnesses'

observations of Jane Doe's actual interactions, conversations and affect/demeanor, both at the

time of the alleged incident and in the succeeding days, was not pursued. In this vein, critical

witnesses, who should have been interviewed by the investigation team, included -

**(1) Sophia Lin Kanno** who, while she was interviewed on May 17, 2019 by Ms. Cleary,

Ms. Bentley and Dr. Stedinger about the events of March 15, 2019, was not asked in any

depth about witness Kanno's other conversations and interactions with, or observations of

Jane Doe's demeanor or emotional state, on Saturday, March 16, 2019 and Sunday, March

17, 2019. (Exhibit "J", at pp. 73, 75);

**(2) Chef Antonio Vesco of the Hotel School**, whom Jane Doe identified as being one of

the five members of the circle of individuals who were present at the time of the incident,

(including Jane Doe, plaintiff, Ms. Kanno, Chef Latimer and Chef Vesco). (Exhibit "I", at

pg. 61). In fact, no effort was made by the investigating team to reach out to Chef Vesco,

[45]

who could have provided competent testimony as to what he observed at the time of the alleged incident.

**(3)** Finally, Francesca Filippini was specifically identified by witness Heather Kolakowsi, (reporting faculty member of the March 15, 2019 incident) as someone to speak with, as Jane Doe discussed this alleged incident with Ms. Filippini the morning after its' occurrence. No witness interview of Ms. Filippini was ever conducted by defendant's Title IX investigatory staff. (Exhibit "N", pp. 124, 125);

**b)** the investigators and faculty co-investigator failed to obtain valuable documentary evidence from the Hotel School of the HEC event on Friday, March 15, 2019, despite being advised by plaintiff and Instructor Heather Kolakowski that extensive photographic and video evidence was available of the HEC event on the date of the incident. (Exhibit "G", at pp. 25, 26; and Exhibit "H", at pg. 36) Compounding the seriousness of this omission was Ms. Cleary's assurance that she would do so, then not following through whatsoever. (Exhibit "G", at pp. 23, 26, 29); and

**c)** the investigators and faculty co-investigator largely ignored or discounted the overwhelming exculpatory evidence of the numerous witnesses, present within feet of the plaintiff and Jane Doe, who did not observe any untoward physical conduct, or any reaction thereto, from Jane Doe to the alleged sexual incident. Again, this alleged incident purportedly occurred in a room of nearly one hundred people milling about, at any one time.

**128.** Defendant, in its investigation of Jane Doe's complaint by the Title IX office, ignored **blatant inconsistencies in Jane Doe's own account** as to the happening of the incident and

[46]

the identity of those individuals present at the time, which were not minor variations in her

testimony. (Exhibits "C", at pp. 2, 4; "I", at pp. 60, 61, 62, 66, 68)

**129.** Defendant, in its investigation of Jane Doe's complaint by **the Title IX office, failed to**

**afford plaintiff due process**, in accordance with the NYS Education Law §6445(5) and the

2017 DCL and other OCR guidance, by failing to allow plaintiff any hearing whatsoever at

which his witnesses and evidence could be presented and Jane Doe and her witnesses cross-

examined, instead relying on the biased, anti-male investigatory system which had been utilized

by defendant in Policy 6.4 since 2013. (Exhibits "A" and ¶¶ "49", "50", *supra*)

**130.** Defendant's Title IX office **improperly applied the preponderance of evidence standard**

to the evidence adduced as a result of its investigative interviews by:

**a)** ignoring all accounts of competent witnesses who were present at the time of the incident

on March 15, 2019 (whose accounts would have been corroborated by video/photographic

evidence taken of the HEC event, but never reviewed by defendant's Title IX investigators).

Instead, the investigators relied solely on the uncorroborated testimony of Jane Doe and the

incompetent testimony of Michele Lin, a close personal friend of Jane Doe, who merely

'parroted' the testimony of Jane Doe as to the alleged sexual battery at the HEC event;

(Exhibit "O", pp. 132, 134, 135); and

**b)** employing a distorted and wholly unrecognized standard of evidence, viz. *"objectively*

*possible"*, in which defendant's Title IX Investigatory Report, in an obvious clumsy and

wholly unsupported manner, elevated speculation and assumption to equivalency with

"preponderance of evidence" (Exhibit "P", pp. 9, 10, 11)

[47]

**131.** In the investigation and adjudication of Jane Doe's complaint against plaintiff, involving prohibited conduct by a faculty member under Policy 6.4, OCR guidance required a timely process for resolution. [¶¶ "45 b)", "45 d)", "48 e)", "50 b"]

**132.** Defendant's Title IX **investigation and adjudication of Jane Doe's complaint was untimely** by reason of the following, incontrovertible facts:

**a)** the investigation was first commenced on April 15, 2019 when Jane Doe filed her complaint of prohibited conduct against plaintiff;

**b)** on April 23 2019, plaintiff's first intake interview transpired nine (9) days later;

**c)** on May 7, 2019, witness Heather Kolakowski was interviewed nineteen (19) days later;

**d)** on May 9, 2019, plaintiff's second intake interview occurred two (2) days thereafter;

**e)** on May 9, 2019, witness Christian Latimer was interviewed zero (0) days later;

**f)** on May 9, 2019, witness Douglass Miller was interviewed zero (0) days later;

**g)** on May 9, 2019, witness Sarah Monaghan was interviewed zero (0) days later;

**i)** on May 14, 2019, plaintiff's second intake interview transpired (5) days later;

**j)** on May 17, 2019, witness Sophia Lin Kanno was interviewed three (3) days later;

**k)** on June 25, 2019, plaintiff's formal interview occurred thirty-nine (39) days later;

**l)** on July 17, 2019, witness Michelle Lin was interviewed twenty-two (22) days later;

**m)** on November 8, 2019, defendant's ***Title IX office completed its final Investigative Report, one hundred thirteen (113) days later***;

[48]

**n)** on November 11, 2019, plaintiff received the final investigative report, three (3) days later;

**o)** on November 25, 2019, plaintiff submitted his objections to the final investigative report, thirteen (13) days later;

**p)** on December 6, 2019, plaintiff was found responsible for violating prohibited conduct under Policy 6.4, and issued sanctions for such violation, eleven (11) days later;

**q)** on December 8, 2019, plaintiff appealed the finding of responsibility and sanction, two (2) days later; and

**r)** on December 13, 2019, plaintiff's appeal was denied, resulting in a final determination by defendant, five (5) days later.

**133. Thus, from the commencement of the proceeding under defendant's Policy 6.4 until the determination of plaintiff's appeal, *a total of two hundred forty-six (246) days elapsed, or some eight (8) months*.** Nearly one half of that entire period was consumed in the creation of a final investigative report, which was eventually distributed to the parties. By any rational measure, the length of time taken in the investigation and adjudication of plaintiff's matter was unreasonable, in violation of defendant's Policy 6.4 and OCR guidance, and prejudicial to plaintiff.

134. In the investigation and adjudication of Jane Doe's complaint against plaintiff, **defendant ignored crucial provisions of its Policy 6.4 for resolution of alleged wrongful conduct** by **faculty members** in the following respects:

[49]

**a)** according to Policy 6.4, the 'reviewer' of the final investigative report is designated as

> "[A] university official who reviews investigation reports and makes a final determination under this policy of (1) whether a complaint is meritorious, and (2) if so, what sanctions should be imposed. Review of complaints against faculty under this policy shall be by a dean or equivalent unit head with authority over the respondent(s). …"

(Exhibit "A", pg. 13);

**b)** as designated by defendant's Title IX office, the Dean of the Hotel School, Kate Walsh, was the appointed 'reviewer' of the final investigative report. (Exhibit "F", at pp. 9, 13, 14)

**135.** In fact, Dean Walsh did not undertake her duties as reviewer, presumably under pressure from and/or at the direction of Dean Hallock. These actions on the part of both Dean Walsh and Dean Hallock were improper, without precedent and prejudicial to plaintiff.

**136.** Instead, Dean Hallock (dean of the S.C. Johnson College of Business) unilaterally and without any jurisdictional basis or legal precedent, undertook this position without input from plaintiff. At the time of improperly undertaking his duties as 'reviewer' of the Final Investigative Report, Jane Doe was a special assistant in his office, presenting an irreconcilable conflict of interest. [¶ "34" of the complaint]

**137.** In light of the fact that Jane Doe was a special assistant in his office, Dean Hallock had an ethical/legal obligation to disclose this blatant conflict of interest to defendant's Title IX office, thereupon recusing himself from acting as 'reviewer' in the proceeding pending against plaintiff.

**138.** Instead, Dean Hallock neither advised anyone of this irremediable conflict, nor voluntarily recused himself, finding plaintiff 'responsible' of a violation of Policy 6.4 and imposing on him

the sanctions recommended in the Final Investigative Report. [¶¶ "113", "114" of the complaint]

**139.** Defendant compounded the foregoing Policy 6.4 violation by permitting Dean Hallock, in

complete disregard of these protocols, to act as the 'adjudicator' of plaintiff's appeal. In fact,

in consonance with Policy 6.4, plaintiff's appeal should have properly been directed to the

Committee on Academic Freedom and Professional Status of the Faculty for further actions

in reference to plaintiff's appeal. (Exhibit "A", at pp. 11-12, 15-18)

**140.** Still further, prior to the filing of a complaint by Jane Doe against plaintiff, Dean Hallock

was prejudiced against plaintiff by reason of the latter's vocal and strong opposition to the

merger of the Hotel School into the S.C. Johnson College of Business in 2018 (with Hallock one

of the leading proponents of the merger and who was slated to, and did, become its first dean).

**141. Defendant's wholesale and conscious disregard of its Policy 6.4, in the adjudication**

**and resolution of complaints against faculty by women, was owing to the tremendous**

**pressure which the administration and its Title IX office felt because of the atmosphere on**

**campus that there was a male "rape culture", as evidenced by:**

   **a)** widespread, strident campus protests;

   **b)** numerous unfavorable newspaper articles and opinions, criticizing defendant's failure

   to - vigorously 'prosecute" and/or stop mishandling female complaints against males;

   **c)** administration statements supporting a sustained crackdown on sexual violence against

   women and pledging to do so;

   **d)** the largest number of pending OCR complaints against defendant in the nation, coupled

   to defendant's fear that if it did not prosecute and adjudicate males responsible for violations

[51]

of sexual assault, it would lose substantial federal educational funds; and

**e)** the sentiment, vocalized by numerous student groups, that complaints against male respondents involved in sexual violence against females should continue to be vigorously 'prosecuted' against males without affording them any hearing or rights of cross-examination.

**142.** Plaintiff's erroneous outcome was the product of pervasive anti-male, gender bias at defendant's campus.

## PRAYER FOR RELIEF

As a result of the erroneous outcome, plaintiff sustained injuries proximately resulting from defendant's negligent, wrongful and/or deliberate actions, in violation of 20 USC §1681, for which he seeks the following relief against defendant:

**i)** compensatory damages in such amount as the trier of fact may award for mental and physical pain and suffering, reputational damage, medical costs, lost salary and other economic loss attributable to defendant's wrongful determination of responsibility;

**ii)** punitive damages in such amount as the trier of fact may award for defendant's highly negligent, reckless and/or deliberate conduct, which evinced a criminal indifference to plaintiff's statutory and university conferred rights;

**iii)** attorney's fees in such amount as may be awarded by the trier of fact;

**iv)** injunctive relief - expunging the finding of responsibility, canceling the sanctions imposed against plaintiff and destroying all records concerning the illegal and wrongful Policy 6.4 proceeding initiated by defendant against him;

**v)** injunctive relief - directing defendant to issue a public statement from its' president or

[52]

board of directors to the Cornell community, admitting that the Title IX office's formal investigation into allegations of sexual misconduct by plaintiff was affected by bias, in derogation of university Policy 6.4 resulting in an erroneous finding of responsibility against plaintiff, in violation of his rights guaranteed pursuant to Title IX of the 1972 Educational Amendments (20 USC §1681); and

**vi)** such other and further relief, including statutory costs, disbursements and interest on any award, as to this Court may seem just and proper in the circumstances.

JURY DEMAND

Plaintiff demands a trial by jury of all permitted issues in this action.

**Dated:** November 28, 2022.

Respectfully submitted by:<br>
H. Roske Associates LLP<br><br>
by:<br>
Steven A. Lucia, Esq., of counsel<br>
Attorneys for Plaintiff<br>
350 Fifth Avenue, Suite 5220<br>
New York, NY 10118<br>
(585) 313-8458<br>
slucia@hr-ny.com<br>
NYS Bar Registration #: 2298388<br>
NDNY Bar Roll #514441

[53]