# EXHIBIT "P"

## POLICY 6.4 – INVESTIGATIVE REPORT

**PARTIES**
    **Complainant:** Undergraduate Student at Cornell (pronoun she/her/hers)
    **Respondent:** Giuseppe Pezzotti, Faculty at Cornell (pronoun he/him/his)

**INVESTIGATOR:** Chantelle Cleary, Institutional Equity and Title IX Coordinator
**CO-INVESTIGATOR:** Jery Stedinger, Faculty, and Vanessa Bentley, Title IX Investigator

*I.*    *Notice of Charges and Brief Summary of Alleged Prohibited Conduct*

    1.  Charged Prohibited Conduct: Sexual Assault (20181900)

        • Alleged Conduct: At approximately 10:30 p.m. on March 15, 2019 at the Statler Hotel, located at 130 Statler Drive, Ithaca, NY 14853, After Respondent touched Complainant's arm and shoulder, Respondent touched Complainant's waist under her clothes, and grabbed Complainant's buttocks without Complainant's consent.

*II.*    *Relevant Provisions of Policy 6.4 and & the Procedures for Resolution of Reports Against Faculty Under Policy 6.4*

The Formal Complaint contains an allegation of Sexual Assault by a Cornell Faculty member impacting an undergraduate student. Therefore, this case is properly investigated under Cornell University Policy 6.4 ("Policy 6.4") and the applicable Procedures for Resolution of Reports Against Faculty Under Cornell University Policy 6.4 ("Procedures").

The purpose of the investigation is to gather evidence relating to the alleged prohibited conduct and to determine whether the respondent engaged in the prohibited conduct by a preponderance of the evidence (i.e., it is more likely than not that the respondent engaged in prohibited conduct.) (Procedures, Section III. C).

Pursuant to the Procedures, on the date of the alleged misconduct, "Sexual Assault" is prohibited conduct defined as follows:

**Sexual Assault** is a broad category that includes, but is not limited to, public lewdness, rape, sexual battery, and sexual abuse.

    • **Sexual Abuse** is touching of the sexual or other private parts of another person by forcible compulsion or without the latter's consent or with someone who is incapable of consent. Sexual abuse is a type of sexual assault.

    • **Sexual Battery** is touching of a sexual nature of a person by another person by forcible compulsion or without the latter's affirmative consent or with someone who is incapable of affirmative consent. Sexual battery is a type of sexual assault.

Final Investigative Report
(20181900)
Distributed November 8, 2019

1 of 11

PRIVATE
Distribution Not Permitted - See Policy 6.4

### III.   Scope of the Investigation

On March 19, 2019, the Office of Institutional Equity and Title IX received a report that Complainant had reported to Heather Kolakowski that Respondent, a faculty member, had touched her buttocks and lower back with his hand without her affirmative consent. On March 27, 2019, Complainant met with the Deputy Title IX Coordinator for Investigations and shared her experience. On April 15, 2019, Complainant signed the Formal Complaint. On April 23, 2019, Respondent was provided Notice of the Formal Complaint and a "no-contact" order was issued. On May 14, 2019, Respondent met with the Title IX Coordinator and Faculty Co-Investigator and shared his account of the reported incident. On June 25, 2019, he met with the Title IX Coordinator, Faculty Co-Investigator, and Title IX Co-Investigator, and participated in an investigative interview in which he discussed the allegations in the Formal Complaint.

Between March 27, 2019, and July 3, 2019, the Title IX Coordinator and Co-Investigators conducted investigative interviews of parties and witnesses. Six witnesses were interviewed and are noted in the table below:

| NAME | RELATIONSHIP TO PARTIES |
|---|---|
| Heather Kolakowski | Heather is a faculty member in the Hotel School and advises the Hotel Ezra Cornell (HEC) conference. Heather was the first person to whom the Complainant reported her experience. |
| Sarah Monahan | Sarah is a student in the Hotel School and was on the Board of Directors for the 2019 HEC conference. Sarah observed and spoke with the Complainant, who served as her Assistant Director, immediately after the reported incident and on the following day. |
| Doug Miller | Doug is a faculty member in the Hotel School. Complainant spoke to Doug about her experience with the Respondent. |
| Christian Latimer | Christian is a Chef Instructor in the Hotel School and was present at the HEC dinner on March 15, 2019. |
| Sophia Lin Kanno | Sophia is an alumnus of the Hotel School and former student of Respondent's. Sophia was present during the reported incident. |
| Michelle Lin | Michelle is a friend and classmate of Complainant. Michelle and Complainant were in a Hotel Management group together during the spring 2019 semester. Complainant told her about the reported incident approximately one week after the alleged incident occurred. |

Final Investigative Report
(20181900)
Distributed November 8, 2019

2 of 11

PRIVATE
Distribution Not Permitted - See Policy 6.4

After each investigative interview, the party or witness was given the opportunity to review their interview transcript for accuracy and provide additional comments. Transcript Review Forms submitted by parties and witnesses immediately follow their statements in Appendix A. The interviews were recorded, and the recordings, which are maintained by the Office of the Title IX Coordinator, were available to the parties for inspection by appointment.

## IV.   *Brief Summary of the Investigation*

### A.   Background Relevant to the Reported Incident

Every March, the Hotel School holds a student run conference in Statler Hall called Hotel Ezra Cornell (herein after, 'HEC'). (Appendix A, pp. 6, 119). The HEC conference is a weekend long networking event for alumni, staff, faculty, and students, and is attended by approximately "two to three hundred" people. (Appendix A, pp. 61, 94, 96). On Friday, March 15, 2019, there was a dinner/reception involving the abovementioned groups. (Appendix A, p. 94). Alcohol is served, but students are not permitted to drink. (Appendix A, pp. 4, 76). Complainant served as the Assistant Director on the Board of Directors for the HEC conference. (Appendix A, p. 103). Her task was to ensure that the student managers were effectively utilizing the assigned spaces. (Appendix A, p. 105). Respondent is a senior lecturer in the Hotel School and unofficially advises the HEC event. (Appendix A, pp. 3, 24, 41-42).

#### 1.   *Complainant's Account*

Complainant stated that "everyone" is familiar with Respondent, even if they've never taken classes with him, because he's been teaching at the Hotel School for over 30 years. (Appendix A, pp. 3, 4). Complainant describes Respondent as "almost like a mascot…He's like a sweet old man. It's like Italian guy who loves food." (Appendix A, p. 4). Complainant also stated that Respondent has been known to "set people up." (Appendix A, p. 4). Respondent has a reputation in the Hotel School among the women for being "touchy." (Appendix A, p. 4). Specifically, she stated that he often grabs individuals' forearms or places his arm around their waists. (Appendix A, p. 4). Complainant recalled having her forearm touched by Respondent "at least 5 times" prior to the reported incident. (Appendix A, p. 6).

#### 2.   *Respondent's Account*

Respondent stated that he has taught at the Hotel School for 35 years, and that allegations of sexual or related misconduct have "never happened to [him]." (Appendix A, pp. 21, 27, 32). Respondent further stated,

> It has never happened that anyone brought up something about sexual harassment, or anything like that. No one ever. I've never done anything to do things like that, so that's why I'm really thinking hard about your questions because I run into so many students and many alumni come up, they hug me, all those things. I never. No. I've never done something like that.

Final Investigative Report
(20181900)
Distributed November 8, 2019

3 of 11

PRIVATE
Distribution Not Permitted - See Policy 6.4

(Appendix A, p. 44, see transcript review p. 58). Respondent stated that he is "hospitable" and says hello to everybody. (Appendix A, p. 51).

Respondent stated that he is an advisor for the HEC conference and that while he attended the March 15, 2019, dinner, he was not working the event, but was only there in the capacity as an advisor. (Appendix A, pp. 24, 41-42). Respondent reports that he monitored the alcohol that the students were serving the guests because he was concerned someone might have too much to drink. (Appendix A, p. 41). Respondent stated that he does not drink alcohol at such events. (Appendix A, p. 42).

### 3. *Witness Accounts*

Sophia Lin Kanno stated that she and Respondent became friendly once she graduated from Cornell. (Appendix A, p. 75). Sophia stated that she "knows" Respondent will place his hand on someone's back when introducing them, and that he has done so to her in the past. (Appendix A, p. 75). Sophia also stated that Respondent has complimented her and referred to her as "beautiful" in the past and that he did so at some point during the weekend of the reported incident. (Appendix A, pp. 73, 75). Sophia stated she thought of these as "nice comments" and that she's "never encountered anything that was out of line or inappropriate with him." (Appendix A, p. 77).

Doug Miller stated that Respondent was "very engaging" with the alumni during the HEC dinner. (Appendix A, pp. 95-96). Doug also describes Respondent as being "professional." (Appendix A, pp. 96, 99). Doug has observed Respondent hug a student(s) at a graduation or celebration, but otherwise has not observed him regularly hug his students. (Appendix A, p. 97).

Sarah Monahan stated that Respondent frequently attends HEC and advises the HEC committee. She refers to him as the "nicest professor possible." (Appendix A, p. 110). Sarah also stated that she has observed Respondent grab the shoulder(s) or arms of individuals while speaking with them, but notes that he does it to "guys, girls, professors, students, guests. He just does it to everyone. It's just his mannerism." (Appendix A, p. 111). Sarah stated she is not uncomfortable when/if Respondent touches her, but she "can definitely understand" others being uncomfortable with it. (Appendix A, p. 112). Sarah stated she has not observed Respondent touch individuals on any body parts other than their arms and shoulders. (Appendix A, p. 112).

Heather Kolakowski stated that Respondent was a longtime advisor for the HEC. (Appendix A, p. 120). She stated that he often attends the conferences and engages with students while there. (Appendix A, p. 120). Heather stated that Respondent has touched or held her arm while speaking with her, but that she has perceived it as comforting and not sexual in nature. (Appendix A, p. 127). Heather describes Respondent as an "affectionate person," but states that she has rarely observed him "give hugs." (Appendix A, p. 127).

Michelle Lin stated that she has frequently observed Respondent touching student's "shoulders or something." (Appendix A, p. 133).

Final Investigative Report
(20181900)
Distributed November 8, 2019

4 of 11

PRIVATE
Distribution Not Permitted - See Policy 6.4

### B. Parties' Relationship Prior to Reported Incident

#### 1. Complainant's Account

Complainant stated that she does not currently, nor has she ever taken any of Respondent's classes. (Appendix A, pp. 2-3). Complainant stated, however, that Respondent often visited the Spring 2019 Restaurant Management class that she was enrolled in. (Appendix A, p. 71). Complainant stated that when visiting this class, Respondent would "come over to [her] specifically and say hi." (Appendix A, p. 71). She immediately went on to state, "He didn't do that to everyone in that class. Maybe one or two other people." (Appendix A, p. 71).

She stated that in the spring 2019 semester, Respondent commented on her looks on a number of occasions and asked her "a good amount of times" to visit him in his office to talk. (Appendix A, pp. 2-3). Complainant stated she never visited Respondent in his office. (Appendix A, p. 3).

Complainant stated that she felt like she and Respondent had gotten "close" during the spring 2019 semester because he knew her name and recognized her in the hallways. (Appendix A, p. 69). The two were friendly and would speak "for a couple of minutes" and "there was banter." (Appendix A, pp. 70-71). Complainant also stated that during these interactions, Respondent would touch her forearm and compliment her looks, "with a similar phrase of, like, beautiful inside and out. Like you're very hardworking." (Appendix A, pp. 6, 70).

#### 2. Respondent's Account

Respondent stated that Complainant has never been enrolled in or attended any of his classes, but that she would always smile when encountering him in the hallways and they would exchange greetings. (Appendix A, pp. 20, 36, 40, 47). Respondent stated that she seemed "very happy, very bubbly." (Appendix A, p. 40). Respondent says that he and Complainant had "never had a conversation" prior to the reported incident. (Appendix A, pp. 36, 47). Respondent did not remember ever inviting Complainant to his office to talk, nor did he recall commenting on her looks. (Appendix A, p. 47).

#### 3. Witness Accounts

Michelle Lin stated that the parties were friendly and talked frequently prior to the reported incident. (Appendix A, pp. 132-133). Michelle also stated that Respondent knew Complainant's name and that they would converse about general "random" topics, but not typically about Hotel classes. (Appendix A, p. 134).

### C. March 15, 2019 Reported Incident

#### 1. Complainant's Account

Complainant stated that on Friday, March 15, 2019, at approximately 10:00 p.m., she saw Respondent speaking with Sophia near the Hotel School lounge and she walked up to them and said hello. (Appendix A, pp. 2, 3, 60, 61). Complainant says that Respondent stepped away from

Final Investigative Report
(20181900)
Distributed November 8, 2019

5 of 11

PRIVATE
Distribution Not Permitted - See Policy 6.4

her and Sophia and returned approximately 15 minutes later to further engage in conversation. (Appendix A, pp. 2, 61). Complainant stated that Christian and Chef Vesco also joined the group and conversation.[1] (Appendix A, pp. 4, 61). Complainant stated that the group was standing in a circle when the reported incident occurred, and that Respondent was standing "basically" shoulder to shoulder with her. (Appendix A, pp. 62, 66).

Complainant described that Respondent stood on the left side of her. (Appendix A, p. 61). She stated that he "put his arm around my waist and he touched the skin on the right side of my body." (Appendix A, p. 61). Complainant describes that the Respondent used the "fleshy" part of his finger to caress the skin "side to side" on her waist. (Appendix A, pp. 62-63, 67). Complainant stated, "At that point I had a jacket on, I had a shirt on. It was between the waist, like above the waistband of my pants, and underneath the shirt I was wearing." (Appendix A, pp. 61-62). Complainant recalled that Respondent's hand stayed on her lower right back and waist as he moved it to the left side of her lower back/waist and squeezed her left butt cheek. (Appendix A, pp. 64, 69). Complainant stated, "there was my flesh in his hand." (Appendix A, p. 64). When Respondent grabbed Complainant's buttock, she recalled feeling her body "shut down." (Appendix A, p. 64).

Complainant stated that her brain was "fuzzy" and that 90% of her senses were focused on the placement of Respondent's hand on her body. (Appendix A, p. 63). Complainant compared the fuzziness to feeling like she was underwater with all sounds being "drowned out." (Appendix A, p. 67). Complainant further stated that her body froze and she recalled the sounds in the room "kind of disappearing." (Appendix A, p. 63).

Complainant stated the following regarding her feelings about the Respondent's touch,

> The touch was very deliberate... by deliberate, I mean the movements weren't spastic in any way. They were controlled, not incredibly slow, but it was controlled. The grab was strong and forceful enough that I am convinced that it's deliberate with him touching my waist beforehand.

(Appendix A, p. 69).

### 2. Respondent's Account

Respondent stated that the room in question had "many people around." (Appendix A, p. 36). Respondent recalled that he initially just happened to "bump" into Complainant, but he was unable to recall who said "hi" first. (Appendix A, p. 37). Respondent then recalled introducing Complainant to Sophia in the library lounge and leaving the two women to speak after "two, three minutes." (Appendix A, pp. 12, 21, 27, 39).

---

[1] Complainant later stated that she was unsure if Christian and Chef Vesco walked away before she left the group. (Appendix A, p. 66). Complainant told Heather that Chef Vesco was seated at the table during the reported incident. (Appendix A, p. 124).

Final Investigative Report
(20181900)
Distributed November 8, 2019

6 of 11

PRIVATE
Distribution Not Permitted - See Policy 6.4

He stated that he does not know how he could have touched Complainant's waist and buttocks because he was standing and conversing with both Sophia and Complainant. (Appendix A, pp. 16, 17, 25). Respondent also stated that "[he] couldn't have done it…there were so many people around. It was full of people." (Appendix A, p. 36). Respondent stated he may have touched Complainant's shoulder and arm. (Appendix A, pp. 39-40, 45). Respondent says that he potentially could have touched Complainant's upper back when he said hello, but that he did not touch her lower back. (Appendix A, pp. 23, 36, 39). Respondent stated that he is "positive that [he] did not touch the lower part of [Complainant's] body." (Appendix A, pp. 36, 57, 58). Respondent does not recall specifically touching Complainant's waist or buttocks. (Appendix A, p. 43).

Respondent stated that he did not notice if Complainant appeared upset during the time she was speaking with him and Sophia. (Appendix A, p. 44).

Respondent stated he does not have an explanation as to why his memory and account of what occurred is drastically different from Complainant's. (Appendix A, p. 41).

> 3. *Accounts of Witnesses Who Attended the HEC Dinner and May Have Been Present During the Reported Incident*

Sophia Lin Kanno recalled Respondent introducing her to Complainant as they have similar career interests. (Appendix A, p. 73). Sophia stated that Respondent may have placed his hand on Complainant's back "in terms of presenting" her while he introduced them. (Appendix A, p. 74). The parties and Sophia spoke for approximately 10-15 minutes, and Sophia stated that the parties appeared to have a friendly professor/student relationship. (Appendix A, p. 74). Sophia was unable to recall any physical reaction on either parties' part after the initial introduction. (Appendix A, p. 74). Sophia stated that she was "definitely" drinking alcohol at the event and "may have had two cocktails" leading up to and during the time the conversation took place between the parties and herself. (Appendix A, p. 78). Sophia also stated that her "recollection and [her] memory may be a little affected by that." (Appendix A, p. 78). In reference to Sophia, Complainant had observed, "She probably was pretty drunk I think, and I was facing ... my back was facing the wall, which is why I don't think anyone saw anything." (Appendix A, p. 3).

Christian Latimer recalled that he and his wife spoke with Respondent, but he does not recall engaging in a "conversation circle" with the parties. (Appendix A, pp. 87-88, 89). He stated that possibly Chef Tony Vesco[2] was present during his conversation with Respondent, but that there were no students present. (Appendix A, pp. 87, 89). Christian did not observe any inappropriate interactions between faculty and students at the event. (Appendix A, p. 86).

Doug Miller does not recall seeing Complainant at the HEC event. (Appendix A, p. 95). Doug also does not remember seeing Respondent physically engaging with anyone at the HEC event. (Appendix A, p. 97).

---

[2] Tony Vesco was not interviewed by Investigators.

Final Investigative Report
(20181900)
Distributed November 8, 2019

7 of 11

PRIVATE
Distribution Not Permitted - See Policy 6.4

Sarah Monahan stated she did not observe the parties interact. (Appendix A, p. 110)

### D. **Immediately After Reported Incident**

*1. Complainant's Account*

Complainant stated that less than five minutes after the reported incident, Christian and Chef Vesco walked away from the group. Complainant recalled telling Respondent that she had to go and clean up the rooms. (Appendix A, p. 64). Complainant stated that she walked towards the door and Respondent followed her and grabbed Complainant's forearm again and told her to find him before she left for the evening. (Appendix A, pp. 64-65). Complainant stated that she is "pretty sure" that Respondent then complimented her physical appearance again. (Appendix A, p. 65).

*2. Respondent's Account*

Respondent does not remember how the conversation between him, Complainant, and Sophia concluded or who walked away from the conversation first. (Appendix A, p. 40).
There were hundreds of people there, and he met and talked with many people that evening. (Appendix A, p. 37)

*3. Accounts of Witnesses from the HEC Dinner*

Sophia Lin Kanno stated that after 10-15 minutes of conversing with the parties, Complainant told her and Respondent that she had to go check on something and walked away. (Appendix A, p. 74).

Sarah Monahan stated that Complainant was supposed to stay at the HEC event until 11:00 pm or midnight, but Complainant approached her and requested to leave early due to "personal reasons." (Appendix A, pp. 103-105). Sarah stated that Complainant seemed a "bit upset" and that she is "usually very chipper. And so, she just seemed a little bit somber and sad." (Appendix A, p. 106). Sarah also recalled that Complainant's tone of voice was "quieter than it usually is." (Appendix A, p. 107). Sarah stated that on Saturday, Complainant was not "as present" and as helpful as she usually is and she had to provide more "clear directions" to her, which was atypical for Complainant. (Appendix A, pp. 104-105, 112). Sarah describes Complainant's demeanor as being very "tired and lethargic." (Appendix A, p. 108).

*4. Accounts of Witnesses Who Communicated with Complainant After the Reported Incident*

Heather Kolakowski stated that she was made aware by a third party that Complainant was crying and visibly upset in the HR Room on Saturday, March 16, 2019. (Appendix A, p. 119). Heather reported that Complainant told her that (Complainant) did not want to be around the Respondent and had been avoiding him since Friday evening. (Appendix A, p. 120). Heather stated that Complainant described the reported incident to her and that while doing so,

Final Investigative Report
(20181900)
Distributed November 8, 2019

8 of 11

PRIVATE
Distribution Not Permitted - See Policy 6.4

Complainant was crying and seemed distracted. (Appendix A, p. 121). Heather stated that Complainant told her that Respondent had been standing next to her while engaging in conversation with a guest, when "[he] touched her butt after sliding his hand across her arm and waist." (Appendix A, p. 120). Heather also stated that Complainant always seemed to be moving and doing something, so it was atypical for her to be neglecting her duties. (Appendix A, p. 122).

Michelle Lin stated that Complainant told her about the reported incident approximately a week after it occurred. (Appendix A, p. 135). Michelle stated that Complainant told her that she and Respondent were standing in a "dark room" when he touched her back and "butt." (Appendix A, p. 132). Complainant told Michelle that initially Respondent's hand was on her back and then he "ended up just grabbing [Complainant's] butt." (Appendix A, p. 135). Michelle described that when sharing her experience, Complainant "kept a straight face, avoided eye contact, and just talked about it." (Appendix A, p. 135). Michelle stated that after the HEC weekend, Complainant attempted to avoid the Respondent in classes and hallways. (Appendix A, p. 136). She stated that on or around March 22, 2019, Respondent entered the kitchen in their Restaurant Management class, placed his hand on Complainant's shoulder, and attempted to engage Complainant in conversation. (Appendix A, p. 137). According to Michelle, Complainant refused to make eye contact with him and "just cut the conversation with him. She was very straight to the point, said one word answers." (Appendix A, pp. 137-138). Michelle stated that Respondent walked away from Complainant and Complainant said, "I think he knows I'm not happy with him." (Appendix A, p. 138).

Doug Miller stated that Complainant approached him on April 19, 2019 and stated that Respondent had harassed her and she did not feel comfortable with Respondent being around on her Management Night (April 26, 2019). (Appendix A, p. 92).

E. **Finding with Respect to Sexual Assault Allegation**

Complainant is alleging that Respondent engaged in conduct that violates Policy 6.4's prohibition against Sexual Assault. In analyzing the facts of the case, the factfinder must determine that Respondent engaged in the prohibited conduct by a preponderance of the evidence.

Investigators have identified that the parties' credibility are at the core of this complaint. Witnesses were unable to provide definitive information to resolve the key complaint, though they could corroborate many details. In evaluating the parties' credibility, the investigators examined whether their accounts were consistent, objectively possible, and whether either party had a motivation to fabricate information. For the reasons set forth below, Investigators determined that it is more likely than not that Respondent engaged in the alleged conduct.

*1. Consistency*

Complainant has put forth facts alleging that Respondent's conduct, i.e., touching her arm, shoulder, waist under her clothing, and grabbing her buttocks, occurred without her affirmative consent. Complainant provided details regarding Respondent's body position as it related to where she was standing, which hand he used to touch her waist, how his hand moved across her

Final Investigative Report
(20181900)
Distributed November 8, 2019

9 of 11

PRIVATE
Distribution Not Permitted - See Policy 6.4

waist, and how it felt when Respondent grabbed her buttocks. Complainant's description of the actions was precise and consistent throughout her interviews with investigators. For example, in her March 27, 2019, interview, Complainant stated,

> So he like first clutches my forearm, then he progresses where he puts his arm around my waist, and then he touches the skin on my waist between the shirt and the top of my pants, which was underneath my suit jacket. Then he grabs my left butt cheek."
> (Appendix A, p. 2).

In her July 3, 2019, interview, Complainant stated,

> He put his arm around my waist and he touched the skin on the right side of my body. At that point I had a jacket on, I had a shirt on. It was between the waist, like above the waistband of my pants and underneath the shirt I was wearing and then he grabbed my left butt cheek.

(Appendix A, pp. 61-62).

Additionally, several of the witnesses interviewed provided information that was consistent with each other's accounts of what Complainant had said and that was consistent with what she had told investigators. Heather stated that Complainant told her that Respondent had been standing next to her when "[he] touched her butt after sliding his hand across her arm and waist." (Appendix A, p. 120). Michelle states that Complainant told her that he touched her back and "butt." (Appendix A, p. 132).

Complainant was able to provide specific details about her state of mind while Respondent's hand was on her body and how the alleged conduct affected her in the days and weeks that followed. Complainant's behavior after the incident is consistent with her account of her experience. In the days and weeks after the reported incident, Complainant avoided areas in the Hotel School in which interactions with Respondent were possible, such as hallways and offices. Michelle corroborated Complainant's assertion that she had been avoiding these areas, as well. (Appendix A, p. 136).

Respondent was consistent in stating that he engaged in many different conversations with attendees of the HEC Dinner, and he had been "going from one group of people to another one." (Appendix A, p. 37). Complainant was also consistent is stating that he may have touched Complainant's arm, shoulder, or upper back, but that he did not touch her lower back or buttocks. While Respondent remembers having a conversation with Complainant, it was one of many and he could not provide any clarity or detailed descriptions of his interactions with Complainant during the Reported Incident. He did not recall that anything unusual occurred, and he was consistent in that regard.

### 2. *Objectively possible*

Respondent acknowledges that he was in close physical proximity to Complainant on the date of the alleged incident. He additionally acknowledges that he was able to, and may have made

Final Investigative Report
(20181900)
Distributed November 8, 2019

10 of 11

PRIVATE
Distribution Not Permitted - See Policy 6.4

physical contact with the back of her body. Thus, both parties agree that he had the opportunity to engage in the physical conduct that Complainant is alleging. Investigators weighed the testimony of the parties and determined that the conduct was physically and objectively possible for the Respondent to have engaged in.

### 3. Motivation to Fabricate

The Investigators were unable to identify any potential motives on behalf of Complainant for fabricating a formal complaint of Sexual Assault against Respondent. Complainant has never enrolled in nor attended any course in which Respondent has taught, and she has never been threatened with, nor received, a poor grade from him. This diminishes the possibility of retribution involving her academics. Similarly, Complainant and many of the witnesses describe Respondent as a person with a positive reputation who is well-liked in the Hotel School. Thus, Complainant exposed herself to potential social and education repercussions by bringing forth this complaint.

On the other hand, facing possible sanctions of counseling, suspension, termination, as well as a decline in his favorable reputation within the Hotel School and the University at large, investigators determined that Respondent did have a motivation to either minimize or lie about the behavior he was alleged to have engaged in.

### F.  Findings and Sanction with Respect to Sexual Assault Allegation

With our finding of responsibility, the investigators recommend, *at a minimum,* that Respondent receive counseling and education on workplace sexual harassment and sexual assault, effective immediately, with an alternative or additional sanction of suspension for a period of one semester, when that sanction can logistically be imposed.

Final Investigative Report
(20181900)
Distributed November 8, 2019

11 of 11

PRIVATE
Distribution Not Permitted - See Policy 6.4