# EXHIBIT "Q"

Dear Dean Hallock,

On November 11, 2019 the Institutional Equity and Title IX Coordinator, Chantelle Cleary, sent me the Investigative Report ("Report) and Investigative Record ("Record"). Having reviewed those documents, I would like to provide the following comments about the Report and Record. This is the first opportunity I have had to fully respond to the testimony given by the complainant, ▮▮▮▮▮, and the identified witnesses. Thus, I hope you consider my thoughtful responses to the Record and Report in making a final determination. The following discussion will highlight the three key points: first, the substantive inadequacies in the Report; second, the investigator's lack of precision in applying the standards for prohibited conduct to my alleged conduct; and finally, the unfairness in the investigation, which may have infected the investigation in its entirety.

### I. Inadequacies in the Report

Without having read ▮▮▮ and the witnesses' testimony prior to my interview, when the investigators asked me questions about my interactions with ▮▮▮ before, during, and after the event, I did not know exactly what the investigators were referencing, so my initial interview was not completely responsive. Now that I have read those statements, this section clarifies those responses and highlights the portions of the Report where investigators failed to consider my perspective in making assumptions and jumping to conclusions.

#### A. *Innocuous Conduct Misconstrued by the Complainant and Investigators*

At the time of my first interview I could not remember asking the complainant to come by my office to talk. (App. A, at 47). Since that interview though, I have thought about our interactions more and do remember offering for the complainant to come by my office. However, this was standard practice for how I treat students. I frequently connect students with alumni to help them find job opportunities. This is just what I do. The way the Report is written suggests malintent in offering to meet with the complainant, which is incorrect. The investigators did not inquire into my regular practices with students in this regard nor did they consider that I frequently meet with students to assist their professional development.

Similarly, from complainant's perspective, I "specifically" went over to her during class to say "hi." (Report, at 5). Even though she acknowledged that I did not completely single her out among her classmates (App. A, at 71), based on her comment, investigators implied that I treated her differently from other students and gave her additional attention. I only approached the students I recognized to speak with, and the complainant happened to be one of the students I knew. The investigators should have (but did not) take these interactions at face value—which was nothing more than courteous and friendly behavior between a professor and a student. And as Ms. Kanno, a former student of mine, explained, I am a "friendly professor." (App. A, at 74).

The complainant and investigators also took the compliments I made to the complainant as something that they were not. (App. A, at 5). Ms. Kanno noted:

> He was very polite to me in the sense that he . . . He was kind of telling me that he really thought I was . . . He was really proud of me as a student, that I was

> successful, that I was smart, that I was beautiful. He was saying a lot of different things like that to me. He really felt like it was great that I was being involved with the students at HEC. I talked to him about some of my future ideas and endeavors. So very much so just kind of a good, friendly conversation that we had in terms of just catching up amongst ourselves.

(App. A, at 73). I compliment people—male and female—all the time. I would not have meant anything or suggested anything in telling the complainant that she was "beautiful inside and out." If anything, the comment directly afterwards, telling the complainant that she was "hardworking," (App. A, at 70), shows that I was complimenting her as a student, in the same way I would compliment other students who are hardworking. I compliment everyone I know because that is just who I am, but I did not mean anything sexual or suggestive by complimenting complainant. The investigators suggest that I complimented the complainant's appearances on multiple occasions, (Report, at 8), however they should not have placed too much focus on this portion of the testimony because, as complainant recognized, she was only "pretty sure," (App. A, at 65), suggesting that the investigators should not have treated this a factually supportive of complainant's allegations.

In addition, the complainant and the investigators misconstrued what I said to the complainant later in the evening. The Report concludes that I "told her" to come find me before she left that evening. (App. A, at 8). Although I could not remember this during my first interview, I likely said something like that to the complainant. However, if I said something like that (even the complainant stated, "I don't remember exactly his words (App. A, at 65)), it was because I wanted to speak with the complainant to hear about her conversation with Ms. Kanno. I believed that connection would be fruitful for the complainant and simply wanted to follow-up after I made the introduction.

The investigators included an entire section in the Report to suggest that the conduct the complainant alleges occurred was "objectively possible." (Report, at 10–11). Investigators did *not* consider that this conduct was incidental and accidental. The complainant's shirt did not completely touch to the skirt or pants she was wearing, so it is possible that I incidentally made contact with complainant's skin. Regardless, as I've stated, I do not believe this occurred. Additionally, as Michelle Lin stated, she observed that I "always had [my] hand on her shoulder or something, but [Michelle] noticed that [I] did that with almost all the students that [I] was close with." (App. A, 133). Again, this is how I've always treated all my students. Further, I likely had my hand on complainant briefly to "present her" to Ms. Kanno (App. A, at 74), but would not have grabbed her buttocks in the way complainant describes. Investigators should have also considered the possibility of incidental and accidental contact.

The investigators also failed include all of Ms. Kanno's comments about how I treat my students in the Report which provides clarity that any contact was innocuous: "He's never touched me in a way that was inappropriate or made an advance in a way that was inappropriate to me where I could have felt that he was making an advance to me at all." (App. A, at 77). Sarah also stated, "He's just the nicest professor possible . . . he loves getting to know his students, and he makes up nicknames for everyone, and really knows us well, and always says hi to us in the hall." (App. A,

110–111). These statements go to show that the investigators misconstrued innocuous conduct and treated it as something that it was not to find a possible basis to support the complainant's narrative.

### B. *Investigators' Failure to Consider My Personal Characteristics*

Most noticeably, the Report completely fails to mention or consider any of my unique, personal characteristics and how that likely impacted the way my actions could have been misinterpreted. This is even more confusing considering that investigators cite to the complainant's testimony that she views me as the "Italian guy who loves food." (Report, at 3). As investigators heard during our interviews, I have a strong accent and English is not my first language. However, the investigators did not consider the obvious ways that this could lead to miscommunication between me and the complainant. This point is especially clear in consideration of the way that complainant misconstrued why I asked her to talk to me before she left that evening, and how she misinterpreted the way that I compliment students. There was a clear communication barrier between me and the complainant that impacted our interactions.

Further, the investigators did not consider how my age may have impacted our interactions. I am almost seventy-three years old. Sarah even explained, "He's definitely a little bit older, so he repeats things a lot, and it's like, 'Oh gosh, Giuseppe's here.' Him and I speak in Italian a little bit." (App. A, at 110). If my age may impact my interactions with other students, it was relevant to my interaction with the complainant. However, the investigators did not consider how it could have shaped our interactions or led to miscommunication.

Finally, the investigators did not consider how my background in hospitality impacts my interactions with all people, including students. As Doug explained, I go beyond what most professors do because of my "hospitality sense":

> Well, so, he always wants to help support the students and give them advice, career advice, on where they should go, jobs. And he's also very helpful on connecting students with jobs through his alumni network. And he's also very good of having alumni that he knows come back into the classroom, to help out in the classroom. And he's always . . . he always has . . . he's always been willing to engage with students. There are some faculty members, they don't want to engage outside of the classroom. They walk in, they walk out, that's it.

(App. A, at 96). And that similarly, because I teach in hospitality, prior students initiate physical contact with me: "[A]lumni will want to hug him. So I think a lot of that is a mutual thing. It's not like he's out to hug somebody, opposed to the mutual affection of alumni doing it both ways." (App. A, at 97). This is consistent with how I described myself as being "warm": Warm from the standpoint if they come, they give me hug, I return it. If they shake their hands and things like that, that's what you do." (App. A, at 44).

### C. *Inaccurate Statements*

First, in explaining why the complainant left the HEC dinner when she did, the investigators only stated that the complainant left because of "personal reasons." (Report, at 8). However, the Report

fails to state that the witness also explained that the complainant told her something "happened with her family" and that was the reason why she needed to leave. (App. A, at 104). By leaving out this alternative suggestion for why complainant left early, the investigators failed to consider an alternate, separate reason—unrelated to myself—for why the complainant asked to leave early that evening.

The complainant also misremembered the lighting in the room and where we stood in the room. In particular, complainant conveyed to her friend, Michelle Lin, that the room was "a dark room" (App. A, at 132), and the investigators emphasized this characterization in the Report, (Report, at 9). However, the room was not dark. The lighting was dimmed because of the HEC event but the room was not "dark." All guests had the ability to see what was happening in the room. Further, we did not have our backs facing a wall as the Report indicates (App. A, at 7). There was an open space behind us with a door to my right side.

The complainant also categorizes and judges people without knowing them. For example, she jumped to conclusions with how much alcohol Ms. Kanno had to drink on Friday evening. Ms. Kanno stated, "I may have had two cocktails at that point." (App. A, 78). In contrast, the complainant's testimony indicated that Ms. Kanno was drunk and could not remember any of our interactions. She stated, "She probably was pretty drunk I think." (App. A, 3). This contradiction suggests that the complainant may not have explained her other testimony without the same degree of exaggeration. Complainant also stereotyped her view of me by referring to me as "Italian guy who loves food." (Report, at 3). This one-dimensional characterization of me as a person demonstrates her propensity to make comments without understanding or knowing the person or situation.

Similarly, she seemed to mischaracterize our previous interactions by stating there was "banter." (App. A, at 134). If anything, I was as friendly with the complainant as other students, especially because she always seemed to welcome and was engaged during our conversations. Finally, the Report emphasizes that the complainant felt "dizzy" and as if her senses were not as sharp as they normally are. (Report, at 6). However, the complainant seemed perfectly fine when we interacted. She conversed with me and Ms. Kanno without giving any indication that she felt abnormal.

## II.   Application of the Procedures and Definitions

The Report couches the entire investigator's findings under the category of "sexual assault" without identifying the specific applications of those procedures to the conduct. For example, sexual battery requires that the touching be "of a sexual nature of a person by another person." (Report, at 1). The investigators made no showing that any touching that could have occurred was "of a sexual nature." In fact, investigators noted that Heather Kolakowski said that in the past if I happened to touch her arm while speaking to her, that it was not sexual in nature. (Report, at 4). Specifically, she stated:

> He does like to touch and hold, like my arm when I'm talking to him. But in my interactions with him, I never received any sort of sexual vibe from that. It was more of a comforting, because he's known me for so long and that's how he demonstrates his affection or connection with you is by like holding your hand or holding your arm.

(App. A, at 127). More importantly, other than the complainant's illusive suggestions that my attempts to help her connect with alumni and say hello to her around campus should be taken at more than face value (and inconsistent with what other students have said), there is *no evidence* to suggest that any of my actions were sexual in nature.

Finally, the investigators' findings are based solely on complainant's testimony (either through her direct testimony or what she told other people) and on the "objective possibility" that this could have occurred because I was in close proximity to the complainant. (Report, at 10–11). It is unclear how stating that the "objective possibility" of this conduct occurring tips the scales beyond the burden of proof required to find me responsible.

### III.    Unfairness in the Investigation

The investigators during the investigation should be neutral parties. Because of the co-investigator's commentary throughout the investigation, it appears that he was not neutral during the investigation, which could have impacted the finding and sanctions recommended. For example, on page 129, Heather explains, "Right, so and that's why I said, it's really important to follow-up, but I also, I mean to be very candid, I can't see Giuseppe touching someone inappropriately and meaning it. I could see maybe an inadvertent and being . . . but like it would crush him. He'd be so sad to think that Ann is so upset, that he made a student upset." (App. A, at 129). Then the co-investigator inappropriately shared his perspective: "I can identify with that without knowing him or anything, you can certainly imagine somebody slipping sometime." (*Id.*) If that is his personal opinion of this matter, and he offered his opinion to a witness, how is he a neutral investigator?

The co-investigator made similar comments throughout the investigation with Heather and other witnesses. With Heather, he commented "smart" in response to how she approached the situation. (App. A, at 119). And also, "I appreciate your candidness, representing the student and being concerned about the faculty at the same time." (App. A, 129). To Sarah, he described her characterization as helpful with, "that's a nice term." (App. A, at 111). These comments suggest that the neutrality expected in an investigation led by the Office of Institutional Equity and Title IX was lacking and may have colored the investigation and Report.

Like Heather stated, I am sad and upset over this situation. I am upset not because I did what the complainant is claiming, but because I try to go above and beyond for my students, to help them find great jobs after graduation, and to make them feel welcomed in the Cornell community. I am upset because this has made me question my welcoming attitude and willingness to help students, and because I would never want to make someone feel uncomfortable. This investigation has continued since last semester, so it has been difficult for me to understand how to act appropriately around students. Students will approach me with their arms outstretched for a hug, but I am now afraid to make anyone feel uncomfortable. Thus, I would like some resolution to this matter soon.

*   *   *

Thank you for your time and consideration.

Sincerely,
Giuseppe Pezzotti